**In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.**

**Adelphia Communications Corp., et al., Plaintiffs,**

**v.**

**John J. Rigas, et al., Defendants.**

**Bankruptcy No. 02–41729 (REG).**
**Adversary No. 02–08051(REG).**

United States Bankruptcy Court, S.D. New York.

March 24, 2005.

Boies, Schiller & Flexner LLP, by Phillip C. Korologos (argued), Armonk, NY, George F. Carpinello (argued), Albany, NY, for Plaintiff Adelphia Communications Corp.

Dilworth Paxson, LLP, by Lawrence G. McMichael (argued), Christie M. Callahan, Philadelphia, PA, for the Rigases.

Brown Raysman Millstein Felder & Steiner LLP, by Michael V. Blumenthal (argued), Gerard S. Catalanello (argued),

Frederick L. Whitmer, James J. Vincequerra, Shannon R. Wing, New York City, for the Rigases.

Kasowitz, Benson, Torres & Friedman LLP, by David M. Friedman, Michelle L. Fivel, New York City, for the Creditors' Committee.

Bragar Wexler Eagel & Morgenstern, P.C., by Debra Kramer, New York City, for the Equity Committee.

## DECISION ON RIGASES' MOTION FOR MANDATORY PRELIMINARY INJUNCTION DIRECTING PAYMENT OF EXPENSE COSTS FROM MANAGED ENTITIES, AND ON ISSUES ON REMAND WITH RESPECT TO EARLIER, RELATED, INJUNCTION

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction

In this adversary proceeding under the umbrella of its jointly administered cases under chapter 11 of the Bankruptcy Code, plaintiff Adelphia Communications Corporation asserts claims against its former management, John, Timothy, Michael, and James Rigas (the "Rigases"); members of the Rigases' families; and 26 entities that the Rigases own (the "Rigas Family Entities")—including 11 Rigas Family Entities that are presently managed by Adelphia (the "Managed Entities"), and that are under Adelphia's day-to-day control.[1] In

---

1. The Managed Entities—which include corporations, general partnerships, limited partnerships, and limited liability companies—own cable properties that generate substantial revenues, and are not debtors before this or any other court. They are currently managed by Adelphia pursuant to a stipulation entered into in connection with an appeal of an earlier decision of this Court.

 Adelphia contends that the number of Managed Entities in fact is only 11, and not 16,

as the other five are holding companies or defunct entities that are not managed by Adelphia, and do not have assets from which advancement or indemnification could be paid, at least without receipt of dividends from their subsidiaries. (*See* Adelphia Mem. in Further Opp'n at 3 n. 2.) After review of the evidence (*see* Rhee Decl. ¶¶ 2–6), the Court agrees, and finds accordingly. But the Court addresses all 16 of the

their capacity as directors (or the equivalent[2]) of the Managed Entities, the Rigases approved resolutions authorizing payments to themselves for advancement or indemnification with respect to their very sizable defense costs in the many civil and criminal proceedings that have been brought against them. The Court has before it the Rigases' motion for a mandatory preliminary injunction directing Adelphia to pay from the Managed Entities an additional $10.2 million[3] (over amounts this Court previously authorized under earlier mandatory preliminary injunctions), pursuant to the resolutions the Rigases approved.

The Rigases' motion meshes with related issues that this Court must consider after a remand from the district court (Hon. Gerard Lynch, U.S.D.J.), which heard cross appeals taken by each of Adelphia and the Rigases from earlier decisions by this Court on this and related matters. The district court affirmed in part and vacated and remanded in part this Court's earlier determinations with respect to the Rigases' ability to dispose of assets that each side has contended is its property. The district court ruled, *inter alia*, that matters as to the corporate governance of the Managed Entities (and in particular, the Rigases' ability to tap as-

sets of companies they owned to meet their defense costs), which this Court had considered appropriately decided by state courts (such as the Delaware Chancery Court), should be addressed by this Court instead.[4] The district court remanded to this Court to decide those matters and to make appropriate findings.

This Court has now done so. As conclusions of law, the Court determines that the Rigases were entitled to the earlier mandatory injunction they sought, and are entitled to the additional mandatory injunction they now seek, to the extent, but only the extent, that for any given alleged Managed Entity:[5]

(1) advancement or indemnification is either:

 (a) obligatory (by reason of contract, bylaws or other organizational documents, or statute), or

 (b) was authorized by what the Court will call "appropriate corporate action"; and

(2) can be accomplished out of the Managed Entity's cash flow without requiring a subsidy from Adelphia; and

(3) can be accomplished without payment of an unlawful dividend or oth-

---

alleged Managed Entities for the sake of completeness.

**2.** As noted, some of the Managed Entities are not corporations, but the Rigases have analogous decision-making authority. Except where the distinction matters, the Court will refer to the Managed Entities as if they all were corporations, and from time to time will refer to some of the matters addressed below as matters of "corporate governance," or "appropriate corporate action."

**3.** The $10.2 million (approximately) is comprised of $6,772,593 for expenses on the criminal side, and $3,470,000 for expenses on the civil side. (*See* Rigas Supplement to Mot. (Adv. Pro. ECF # 268) ¶ 4).

**4.** *See Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.)*, 2004 U.S. Dist. LEXIS 19478, at *37–*39, 2004 WL 2186582, at *12 (S.D.N.Y. Sept. 27, 2004) (Lynch, J.) (the *"District Court Opinion"*). It was filed in this adversary proceedings docket as ECF # 275.

**5.** As described more fully below, the Court believes it is plain that the obligations must be decided on an entity-by-entity basis, under the bylaws or other relevant organizational documents, and applicable governance law, for each particular Managed Entity.

er transfer from another alleged Managed Entity.

In determining whether advancement or indemnification is obligatory, the Court must determine, with respect to each Managed Entity that might otherwise have an advancement or indemnification obligation, whether the recipient meets what this Court calls the "by reason of" requirement—that the recipient was brought into the legal proceedings "by reason of the fact" that the recipient was a director or officer, or "because" he or she was such. In instances where advancement or indemnification is permissible but not obligatory on the part of the Managed Entity (and hence where the Court must consider whether advancement or indemnification has been authorized by appropriate corporate action), the Court determines that the "entire fairness" test, described more fully below, is applicable and must be satisfied. And the Court notes that if any Managed Entity was insolvent at the time that decisions as to advancement or indemnification were made, the entire fairness test requires consideration of the needs and concerns of the *company as a whole*, with due regard to the priorities of stakeholders to the company's assets—which means, as a practical matter, that the needs and concerns of creditors, and not just shareholders, must be taken into account, along with the higher priority that creditors have to an insolvent company's assets.

As mixed questions of fact and law, the Court then concludes that for 4, but only 4, of the alleged Managed Entities, advancement is obligatory.[6] But of these 4 entities, 2 of them are not really Managed Entities at all, and payments by them would require an improper dividend upstreamed to them by their subsidiaries, which this Court cannot and will not direct[7]—leaving 2 of the 11 actual Managed Entities[8] that can and should advance defense costs to the extent they can afford to do so. The Court further concludes that all 11 of the Managed Entities would have obligatory indemnification obligations with respect to completed matters in the absence of disqualifying outcomes,[9] but that

6. Those entities providing for obligatory advancement are Highland Carlsbad Cablevision, Inc., a Delaware corporation ("Highland Carlsbad"); Highland Prestige Georgia, Inc., a Delaware corporation ("Highland Prestige"); Bucktail Broadcasting Corp., a Pennsylvania corporation ("Bucktail Broadcasting"); and Coudersport Television Cable Co., a Pennsylvania corporation ("Coudersport Television").

7. Highland Carlsbad and Highland Prestige are holding companies with no cash flow of their own other than by the receipt of dividends upstreamed from their subsidiaries, which, by reason of their insolvency, could not lawfully be declared or paid.

8. Bucktail Broadcasting and Coudersport Television.

9. Those entities providing for obligatory indemnification are each of the Managed Entities listed in the preceding n. 6, *i.e.*, Highland Carlsbad, Highland Prestige, Bucktail Broadcasting, and Coudersport Television.

Entities providing for obligatory indemnification also include Highland Carlsbad Operating Subsidiary, Inc. (f/k/a Daniels Cablevision, Inc.), a Delaware corporation ("Highland Carlsbad Operating"); Prestige Communications, Inc. (f/k/a Prestige Cable TV of Georgia, Inc.), a Georgia corporation ("Prestige Communications"); Desert Hot Springs Cablevision, Inc., a California corporation ("Desert Hot Springs"); Cablevision Business Services, Inc., a Colorado corporation ("Cablevision Business Services"); and Henderson Community Antenna Television, Inc., a North Carolina corporation ("Henderson CATV").

Entities providing for obligatory indemnification also include Adelphia Cablevision Associates of Radnor, L.P., a Pennsylvania limited partnership ("Adelphia Cablevision–Radnor"); Highland Video Associates, L.P., a Pennsylvania limited partnership ("Highland Video"); Montgomery Cablevision Associates, L.P., a Pennsylvania limit-

at this juncture, and on these facts, only Michael Rigas is entitled to indemnification—and then only with respect to the portion of his defense costs previously incurred and unpaid in connection with the now-concluded criminal trial that was for charges other than the wire fraud charges, which do not satisfy the "by reason of" requirement.[10] The Court finds that the percentage of the total defense costs that should be allocated to the wire fraud charges is 10% for all of the criminal defendants.

The Court further finds that all 11 of the actual Managed Entities are jointly and severally liable for the Michael Rigas indemnification. The duties of 4 of them to indemnify "to the extent" that an officer or director was successful are undisputed. With respect to 5 more, the Court cannot subscribe to arguments by Adelphia that they are excused from duties to indemnify; as to those Managed Entities whose organizational documents provide in substance for an exception to the indemnification obligation where the recipient has been expressly or impliedly "determined" to have

acted inappropriately,[11] the Court finds that such a determination as to Michael Rigas has not yet been made, if it ever will be. Finally, with respect to the 2 Managed Entities that are Georgia and North Carolina corporations,[12] whose corporation laws are based on the revised Model Business Corporation Act (the "Model Act") and require that the indemnified person be "wholly successful," the Court finds that an officer or director remains eligible in the event of a hung jury, so long as no count was decided unfavorably with a conviction, adverse verdict, or plea.

With respect to Michael Rigas, the Managed Entities can meet the still-outstanding portion of their indemnification obligations to him without drawing upon Adelphia's assets, and without receipt of an unlawful dividend, and the Court will issue the requested mandatory injunction to require further payment by the Managed Entities to the extent, if any, necessary to ensure that he has received 90% of his total costs with respect to his criminal defense.[13] But John and Timothy Rigas,

ed partnership ("Montgomery Cablevision"); Hilton Head Communications, L.P., a Delaware limited partnership ("Hilton Head"); Ionian Communications, L.P., a Delaware limited partnership ("Ionian Communications"); Adelphia Cablevision of West Palm Beach, LLC, a Florida limited liability company ("Adelphia–West Palm"); and Adelphia Cablevision of West Palm Beach II, LLC, a Florida limited liability company ("Adelphia–West Palm II").

10. If there is a second criminal trial, payment of Michael Rigas's defense costs would be an advancement, and not an indemnification, and in this respect, he would be in the same category as all of the other Rigases. Likewise, an additional $50,000 requested by Michael Rigas for the defense of the SEC's action against him would be for advancement of defense costs, to which he would not be entitled to the mandatory injunction requested here, in contrast to the indemnification for his past success, to which he is entitled.

11. Highland Video (expressly), Adelphia–West Palm (expressly), Adelphia–West Palm II (expressly), Hilton Head (impliedly), and Ionian Communications (impliedly).

12. Prestige Communications and Henderson CATV.

13. Indemnification is limited to 90% of the total since, as discussed above and below, indemnification can be awarded only to the extent that the recipient was named in the litigation "by reason of" his or her status as a director or officer of the entity from whom the indemnification is requested. And the Court finds that it must subtract out the costs it should allocate to the wire fraud charges, which by reason of their underlying nature, do not satisfy the "by reason of" requirement. But the Court further recognizes that the unreimbursable wire fraud charges represent a rather modest portion of the totality of the charges against John, Timothy, and Michael Rigas, especially in light of the conspiracy

found guilty of conspiracy and several substantive criminal counts (charging securities and bank fraud), but acquitted of other substantive counts (charging wire fraud), plainly are not entitled to obligatory indemnification for the portion of their defense costs (90%) relating to the charges for which the jury returned guilty verdicts. Nor are they entitled to obligatory indemnification for the 10% portion of their legal fees attributable to the wire fraud counts, since, as noted, the wire fraud counts do not meet the requirements of the "by reason of" rule. Those collectively account for 100% of the charges against them, and they thus are not entitled to any obligatory indemnification.

Based on their obligatory advancement obligations, the Court will also authorize and direct advancement by Bucktail Broadcasting and Coudersport Television to the extent of their positive cash flow,[14] so long as that can be done without a draw on Adelphia assets, and subject to any applicable setoffs. But the Court further finds, as mixed questions of fact and law, that for the rest of the Managed Entities, advancement is discretionary and not obligatory—and that the Rigases failed to meet the requirements for appropriate corporate action as a consequence of their failure to satisfy the requirements of the entire fairness test, which was not met in light of the procedural and substantive deficiencies in their determinations as to their entitlement to payment, discussed below. None of the Rigases is entitled to discretionary advancement on this record.

The Court further finds that the Managed Entities have been named in this adversary proceeding principally or entirely as nominal defendants, and that the real issue in this case, as far as the Managed Entities are concerned, is who will ultimately own the Managed Entities. It further finds that the real parties-in-interest in this case on the defendant side are not the Managed Entities, but rather the Rigases themselves. As a result, the Court will not authorize or direct payments to be made by the Managed Entities, ostensibly for their own defense, by reason of the argument that the Managed Entities "need to defend themselves"—or, more fundamentally, allow the status of the Managed Entities to be used as a back-door means to direct the payment of defense costs for the Rigases' benefit that would not otherwise be payable.

Accordingly, the new motion for a mandatory injunction is otherwise denied; the earlier mandatory injunction is now vacated; and the Court will entertain further proceedings, with further opportunity to be heard, with respect to how it should

---

charge that was made against each of them, with respect to which only Michael Rigas was acquitted.

Up to this point, fees were advanced to or for the benefit of Michael Rigas that presumably were applied to his criminal defense costs at a 100% rate. In light of the 90% award, counsel should confer to ascertain whether, on an overall basis, he has been overpaid or underpaid. If necessary, any disputes in that regard can be brought to the attention of the Court.

14. The evidence submitted to the Court on cash flow was of a highly proprietary nature, was taken under seal, and will not be discussed in this public decision. The Court here provides its ruling in principle, in the hope that the parties can agree on the proper amounts that then are payable. The Court has briefed the parties separately with respect to line items it considered to be included or excluded in the relevant computation, and has addressed with them questions it had with respect to how capital expenditures had been treated in the financial data that was in exhibits submitted to the Court. It will also wish the parties to advise the Court as to the extent, if any, to which the final numbers awarded can be made public without resulting injury to stakeholders.

deal with any overpayments that were made pursuant to the earlier mandatory injunction.[15]

The following are the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with this determination.

### Facts

The Court finds the following as facts, or, where applicable, as mixed questions of fact and law.

### A. Background

The Rigases are the largest shareholders of Adelphia, which was founded by John Rigas, but they are not its only ones; much of Adelphia's equity securities are held by others. Adelphia also has billions of dollars in public debt. Until May 2002, John, Timothy, Michael, and James Rigas were the highest officers of Adelphia, and each was an Adelphia director. In May 2002, after disclosure (or, as some contend, increased disclosure)[16] of matters that are the underlying issues in this adversary proceeding—most significantly, the Rigases' use of over $3 billion borrowed from banks under "co-borrowing facilities" that Adelphia was obligated to repay—the Rigases resigned as officers and directors of Adelphia.

In June 2002, Adelphia and its subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Adelphia brought this adversary proceeding on July 25, 2002, asserting numerous claims against the Rigases under both federal and state law, principally for alleged self-dealing and looting of Adelphia, including claims under RICO, under the Securities and Exchange Act of 1934, for breaches of fiduciary duty, for recovery of fraudulent conveyances, to demand an accounting, and to impose a constructive trust on assets that found their way into the Rigases' hands.

### B. Relevant Proceedings

#### 1. The Temporary Restraining Orders

On August 26, 2002, Adelphia sought and obtained the first of two temporary restraining orders (the "TROs") that this Court entered in this action (the "First TRO").[17] The First TRO, premised on sections 362 and 105(a) of the Code, enjoined disposition by the Rigases and entities acting on their behalf of *real property,* based on a showing that those properties were property of the Adelphia estate (because the Rigases had promised to deed them over to Adelphia, but had not done so), or were likely to be determined to be property of the Adelphia estate.

On November 25, 2002, after learning that the Rigases were cutting and selling timber on some of the property subject to the First TRO, Adelphia sought a second, and broader, TRO (the "November 25 Motion")—which would restrain the disposition of *all* assets of the Rigases, not just

**15.** Adelphia's motion for a stay pending appeal with respect to the earlier injunction was denied by the district court. This Court understands that payments have thus already been made to or for the benefit of the Rigases on advances that the Court now finds should not have been made.

**16.** Parties in this and other litigation under the umbrella of Adelphia's chapter 11 case contend that there was earlier disclosure of some or all of the matters in controversy to various persons or entities, and to the public. The Court now makes no findings in that regard.

**17.** The application for the First TRO was heard on (telephonic) notice, and counsel for the Rigases appeared by telephone. The Court delivered an oral ruling on August 26, 2002, and its formal written order was entered on September 10, 2002. (Adv. Pro. ECF # 15.)

their real property—based on a showing that an even broader array of their assets were property of the Adelphia estate; that the Rigases held much or all of their property in constructive trust for Adelphia; and that non-disclosure on the part of the Rigases of their assets and non-compliance with discovery requests for information made a further accounting impossible. This Court granted the requested relief *ex parte* for 24 hours, and held a hearing on notice on the following day, November 26, with all affected parties present.

Affidavits submitted with Adelphia's November 25 Motion established a prima facie case that the Rigases used Adelphia's cash management system (the "CMS") to transfer hundreds of millions of dollars from Adelphia to themselves or to Rigas Family Entities, and that the Rigases used the co-borrowing facilities to make Adelphia jointly and severally liable for loans that at least primarily benefited the Rigases personally. The Court granted the requested broader TRO (the "Second TRO"), freezing all assets of the Rigases and Rigas Family Entities. But the Court provided that any "working property," such as office buildings or agricultural property, would be permitted to use its proceeds to pay ordinary course expenses, and, significantly, that the Rigases would be entitled to use whatever funds were necessary for reasonable living expenses and for their criminal and civil defense costs.[18] The

18. Judge Lynch observed that an asset freeze of the type this Court imposed was "an extraordinary and dramatic provisional remedy," *see District Court Opinion*, 2004 WL 2186582, at *8, and of course it was—though as Judge Lynch also recognized, *see id.* at *8–*10, this Court took measures to avoid undue hardship. But this Court notes, to allay uncertainties in this regard, that when it issued the TRO, it expressly considered whether an "asset freezing injunction" of the type requested here was appropriate in light of the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

*Grupo Mexicano* was a case in which equitable claims had not been presented, and an asset freezing injunction was sought solely to protect a future money judgment. Here, Adelphia made substantiated claims of ownership of much of the Rigases property, and sought the equitable relief of imposition of a constructive trust and recovery of fraudulent conveyances.

Since *Grupo Mexicano* was decided, lower courts have considered whether *Grupo Mexicano* bars asset-freezing injunctions under Fed.R.Civ.P. 64 or 65, where equitable claims *have* been presented. Those courts have repeatedly (and uniformly, to date) held that *Grupo Mexicano* is inapplicable to requests for asset-freezing injunctions where plaintiffs seeking that relief have also made equitable claims. *See CSC Holdings,* *Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (*Grupo Mexicano* "held that a district court may not issue an injunction freezing assets in an action for money damages where no equitable interest is claimed"; where equitable relief—for an accounting and resulting profits—was sought, in the alternative to claims for money damages, *Grupo Mexicano* was inapplicable, and asset-freezing injunction was proper); *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 496–97 (4th Cir.1999) (observing, in Fed.R.Civ.P. 64 context, that "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the courts ability to grant the final relief requested."); *Motorola Credit Corp. v. Uzan*, 202 F.Supp.2d 239, 250 (S.D.N.Y. 2002) (Rakoff, J.) (*Grupo Mexicano* did not bar plaintiffs request for a preliminary injunction since, in addition to asserting money damages, plaintiffs there also asserted a demand for a constructive trust and other equitable remedies); *Quantum Corporate Funding, Ltd. v. Assist You Home Health Care Servs. of Va.*, 144 F.Supp.2d 241, 249–50 n. 9 (S.D.N.Y.2001) (Owen, J.) ("[T]he [*Grupo Mexicano*] Court made a distinction between general, unsecured creditors and those possessing a lien or equitable interest

Court further directed counsel for Adelphia and for the Rigases to agree on a mechanism for permitting expenditures of the authorized funds, and provided that, if agreement could not be reached, the Rigases were entitled to seek relief on "three hours notice"—in particular for any expenses related to their criminal defense.

### 2. The Funding Orders

In July 2003, the Rigases filed a motion to modify the TROs to permit funding of their criminal and civil defense costs from cash generated by private cable companies (the "July 2003 Funding Motion").[19] After oral argument on August 1, 2003 (following earlier extensive briefing on the motion), this Court entered an order ("the August 2003 Funding Order"), granting the Rigases' motion in substantial part, though capping the defense funds to be funded at $15 million. The Court stated that this decision could be reconsidered if there were ever a material change in the facts.[20]

On or about August 12, 2003, Adelphia and the Creditors' Committee filed separate appeals of the August 2003 Funding Order (the "August 2003 Appeals").[21] The August 2003 Appeals were later withdrawn, however, upon the execution of a stipulation (implementing a settlement in the district court) that was approved by this Court on September 2, 2003 (the "September 2, 2003 Stipulation").[22] Under the September 2, 2003 Stipulation, Adelphia agreed not to pursue its appeal of the August 2003 Funding Order granting the Rigases $15 million on account of their defense costs, and the Rigases gave day-to-day management control of the Managed Entities to Adelphia.

On January 30, 2004, the Rigases moved before this Court for an order increasing the $15 million cap on funds for defense costs.[23] After a hearing on that motion on February 18, 2004, the Court granted the

in the property at issue ... courts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to freeze assets"); *Wishnatzki Nathel, Inc. v. H.P. Island–Wide, Inc.*, 2000 WL 1610790, at *1, 2000 U.S. Dist. LEXIS 15664, at *4 (S.D.N.Y. October 27, 2000) (Martin, J.) ("[C]ourts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it[s] equitable power to freeze assets."). *See also Rubin v. Pringle (In re Focus Media, Inc.)*, 387 F.3d 1077, 1085 (9th Cir. 2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 1674, 161 L.Ed.2d 482 (2005), decided after the issuance of the Second TRO ("[W]e hold that where, as here, a party in an adversary bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, *Grupo Mexicano* does not bar the issuance of a preliminary injunction freezing assets."). When the Rigases sought to withdraw the reference of this adversary proceeding, Judge Daniels of the district court expressly considered the Rigases' contention that this Court's issuance of an asset freezing injunction pursuant to the Second TRO was inappropriate under *Grupo Mexicano*, and rejected it. *See Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.)*, 2003 WL 21297258, at *5, 2003 U.S. Dist. LEXIS 9349, at *12–*14 (S.D.N.Y. June 4, 2003) (where plaintiff estate sought not only money damages, but also equitable relief—imposition of a constructive trust and a demand for an accounting—*Grupo Mexicano* was inapplicable).

**19.** Adv. Pro. ECF # 133.

**20.** This Court issued a dictated on-the-record, but unpublished, decision on August 1, 2003. A written order implementing the Court's dictated decision was entered on August 7, 2003. (Adv. Pro. ECF # 143.)

**21.** Adv. Pro. ECF # 144 and 145.

**22.** Adv. Pro. ECF # 151.

**23.** Adv. Pro. ECF # 187.

motion in substantial part on that day, principally as a consequence of changed circumstances on the criminal defense side. It granted the Rigases an additional $12.8 million in funds, though only for the payment of criminal defense costs.[24]

While the Court allowed the Rigases $12.8 million further in funds for criminal defense costs, it did not grant additional funding of civil defense costs at that time—concluding that there had been no material changes, nor had any unforeseeable events occurred, with respect to the civil side, which included the defense of civil litigation, litigation before this Court, and participation in the reorganization process.

Adelphia and the Creditors' Committee, on the one hand, and the Rigases, on the other, all appealed from the entry of the March 2004 Funding Order—though, as might be expected, arguing error with respect to different aspects of this Court's February 18 ruling. Those appeals went to Judge Lynch of the district court. But while, in a dictated decision, Judge Lynch declined a stay of this Court's March 2004 Funding Order, he later issued a written decision on September 27, 2004, published electronically,[25] affirming in part and vacating in part the March 2004 Funding Order. He remanded to this Court to make further findings on the Rigases' legal entitlement to payment of their defense costs from the Managed Entities,[26] and on the Managed Entities' ability to pay (without an Adelphia subsidy) any defense costs

that they might otherwise be required to pay—in other words, whether the Managed Entities "have sufficient cashflow to fulfill the $12.8 million demand without drawing on Adelphia assets."[27]

### 3. The Criminal Trial

On July 8, 2004, after a lengthy jury trial before Judge Sand of the district court, the jury returned guilty verdicts against John and Timothy Rigas with respect to the conspiracy, securities, and bank fraud charges against them. The jury returned not guilty verdicts with respect to the remaining counts of the indictment against them, which charged wire fraud. They have not yet been sentenced.

At the conclusion of that same trial, the jury returned not guilty verdicts as to Michael Rigas in connection with several of the charges against him, and reported that it could not agree with respect to the remainder. While, so far as the record here reflects, a definitive date has not been set for re-trial, the Government has announced its intention to retry Michael Rigas on the charges on which the jury could not agree. On November 15, 2004, Judge Sand denied post-trial motions on behalf of John and Timothy Rigas for acquittal, or for a new trial.

### 4. Adelphia's Summary Judgment Motion

On August 20, 2004, in an effort to expedite consideration on the merits of its com-

---

**24.** Once more, the Court issued a dictated on-the-record, but unpublished, decision after a recess on the day of the hearing. Its ruling was implemented by a written order, dated March 9, 2004 (the "March 2004 Funding Order") (Adv. Pro. ECF # 212.)

**25.** *See supra* note 4.

**26.** *District Court Opinion,* 2004 WL 2186582, at *12 ("[T]he Bankruptcy Court should have

determined whether the Rigases have some legal entitlement to the cashflow of the Managed Entities to pay their personal legal defense costs, either because of some dividend right available on account of their ownership interests or because of a right to indemnification for legal fees as officers and directors of those entities.").

**27.** *Id.*

mon law claims, Adelphia moved for summary judgment (the "Adelphia Summary Judgment Motion")[28] on two of them—alleging unjust enrichment and requesting a constructive trust. Adelphia bases those claims principally on the very substantial sums that found their way to the Rigases, or to companies that the Rigases own, through Adelphia's CMS as a consequence of bank borrowings (the "Co-borrowing Agreements") for which Adelphia, along with the Rigases, is obligated to the co-borrowing banks for repayment. Adelphia summarizes the "central facts" of its motion by stating that the Rigases used $3.2 billion of Adelphia's money and co-borrowed credit to purchase Adelphia securities, to buy cable assets, and to fund their private company expenses.

The Adelphia Summary Judgment Motion is based largely on the declaration of Robert J. DiBella[29] (which, Adelphia contends, shows the borrowings and their amount, and the manner in which the borrowings found their way to the Rigases), and on the books and records of Adelphia that were maintained when the Rigases ran Adelphia (which, Adelphia contends, the Rigases' criminal counsel said were accurate). Adelphia also relies on statements by the Rigases' defense counsel in the criminal trial, which Adelphia asserts acknowledge that the amounts recorded in Adelphia's books reflect amounts that the Rigases owed and intended to pay back to Adelphia.[30]

The Rigases informed the Court of their desire to conduct discovery to defend against the Adelphia Summary Judgment Motion, and thereafter moved before the Court, pursuant to Fed.R.Civ.P. 56(f), for a delay in the consideration of the Adelphia Summary Judgment Motion. On December 2, 2004, in a written decision,[31] the Court deferred consideration of the Adelphia Summary Judgment Motion, pending the completion of some, but not all, of the additional discovery that had been requested.[32] The discovery has now been completed, and with the briefing now having been completed as well, oral argument will be heard shortly.

### 5. The Rigases' Current Funding Motion

On September 14, 2004, the Rigases filed a motion to modify the August 2003 and March 2004 Funding Orders to permit additional funding of defense costs.[33] Specifically, the Rigases asked this Court to direct Adelphia, which has operating control of the Managed Entities, to cause to be paid an additional $10.2 million in funds from the Managed Entities for the payment of the Rigases' civil and criminal defense costs. This would bring the total that the Managed Entities would pay for the Rigases' defense costs up to $38 million.

### C. The Directors' Meetings

The Court finds partly (but only partly) credible, and accepts to the extent stated below, the testimony of James Rigas and Colin Higgin (a Rigas aide who, while at Adelphia, reported to Timothy Rigas) to the effect that twice before and twice after Judge Lynch's decision, the Rigases held

---

**28.** Adv. Pro. ECF # 247.

**29.** Adv. Pro. ECF # 249 and 252.

**30.** Adelphia Mem. of Law in Supp. of Mot. for Partial Summ. J. (Adv. Pro. ECF # 247) at 2–3.

**31.** *Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.),* 317 B.R. 612 (Bankr.S.D.N.Y.2004).

**32.** Adv. Pro. ECF # 305.

**33.** Adv. Pro. ECF # 260.

meetings of directors (or the equivalent for various Managed Entities) to authorize the advancement and indemnification from the Managed Entities that the Rigases now seek to enforce.

Initially, on May 2, 2003 and May 16, 2003, John, Timothy, Michael, and James Rigas—"acting as all, or substantially all, of the Directors of the Managed Entities"[34]—had meetings (the "May 2003 Meetings"), at which it is said that they voted unanimously to advance funds to themselves for civil defense costs, and to John Rigas, Timothy Rigas, and Michael Rigas for criminal defense costs. However, the Court is not in a position to make any findings as to the exact resolutions they then enacted, or the deliberations that preceded the determinations made on those days. Notwithstanding the seeming importance of those resolutions, they were not then reduced to writing,[35] nor were minutes prepared,[36] nor were notes of those meetings produced.[37] James Rigas and Colin Higgin testified with respect to the May 2003 and October 2004 meetings.

The Court found neither to be candid or convincing in his testimony—particularly Higgin, who, while secretary of the meeting each time, took no notes,[38] and whose testimony was generally unworthy of belief. While the Court is prepared to accept as a fact that the Rigases met in May 2003 and went through the motions of approving the payment to themselves of the advancement and indemnification that is the subject of this motion, it is not in a position to find that they engaged in any of the deliberations, or considered any of the matters, that one would expect with respect to resolutions of this character. In particular, the Court is not in a position to find that they considered anything other than what they wanted to meet their own needs and concerns, or that they considered, in particular, their ability to repay amounts advanced, the insolvency of the Managed Entities, the fairness of their action to creditors of the Managed Entities, or whether any of them might actually have done anything wrong.

**34.** Higgin Second Supplemental Decl. ¶ 2.

**35.** Apparently, draft resolutions were prepared, but the Rigases did not produce them to Adelphia in discovery (see 11/22/04 Tr. at 123–126), and they were not produced until the Court ordered their production in mid-trial in the proceedings here.

**36.** See 11/22/04 Tr. at 130–31.

**37.** Id. at 105–07. The Secretary's Certificate purporting to describe the events of those meetings was executed by Higgin on October 20, 2004, some 17 months later. Id. at 108. There was a written agenda for the meeting, dated May 3, 2003 (Adelphia Ex. 1), which listed as Item # 9 for the meeting, "Indemnification Rights of Officers and Directors," and as part of Item # 10, with respect to "Actions to be Taken by Private Companies," "Advance of Defense Costs to Officers and Directors." But the agenda is silent as to what, if any, materials were presented to or reviewed by the attendees at the meeting. (It appears that

while the agenda was dated May 3, 2003, the first of the May 2003 meetings actually took place on May 2, 2003.)

Each of the Rigases executed written requests for advancement, and executed affirmations attesting to his good faith and that he had no reasonable cause to believe that his conduct was unlawful (Higgin Decl. Exs. F–I), in each case dating the document "October 18, 2004," and in some cases also saying, "effective as of May 2, 2003." The Court is compelled to find, and does find, that neither those nor substantially similar documents were prepared, presented, or considered at the May 2003 Meetings. The Court further finds that as of the time of their depositions on October 19 and 20, 2004, neither Timothy nor Michael Rigas had signed the undertakings that were dated October 18, and that the undertakings were in fact signed some time after October 18.

**38.** See 11/22/04 Tr. at 105, 107, 128.

Then, on October 18, 2004, after Judge Lynch had ruled with a decision that would make corporate governance matters of great importance—and with a hearing on these issues coming up about 20 days hence, and after deficiencies in their earlier actions were the subject of questioning at their depositions in the proceedings here—the Rigases held another meeting of the directors (or the equivalent for various Managed Entities) (the "October 18, 2004 Meeting"), at which they once more unanimously voted to advance funds to themselves for civil defense costs and to John Rigas, Timothy Rigas, and Michael Rigas for criminal defense costs.

At the October 18, 2004 Meeting, the Rigases once more discussed advancement and indemnification—this time with an apparent greater attention to detail—and topics of discussion included a presentation by Keith Horn and James Rigas concerning the financial status of the Managed Entities according to the Monthly Regional Operating Packages that Adelphia generates for the Rigases; whether the Managed Entities had sufficient cash flow to make the requested $10.2 million in defense payments; a report by criminal counsel for John Rigas, Timothy Rigas, and Michael Rigas concerning the pending motions for new trials in the criminal proceedings and the jury verdicts that came down in July 2004; a report by civil counsel for the Rigases concerning the status of the civil actions, including the instant action for additional defense funding and the Adelphia Summary Judgment Motion; a discussion by civil counsel concerning Judge Lynch's opinion, Adelphia's objections to the Rigases' additional funding request, discovery relating to the defense funding motion, and the fact that the co-borrowing banks did not object to the Rigases' motion; an explanation by civil counsel of the law governing advancement of expenses and the ultimate right to indemnification; a discussion by the directors and equity holders of the amount of fees requested in the additional funding motion; and a discussion of the directors' fiduciary duties to the Managed Entities.[39] But the topics of discussion do not appear to have included the Rigases' ability to repay any sums advanced if they ultimately were not entitled to indemnification. They also did not include whether advancement would violate express covenants that the Managed Entities had with the co-borrowing banks, though, for reasons addressed below, the Court does not regard this latter deficiency to be material.

Then, on October 26, 2004, after asserted continuing deficiencies in their corporate action (such as the directors' failure to consider whether the Rigases could repay) had been noted in depositions[40] and briefs, the Rigases had a fourth meeting (the "October 26, 2004 Meeting," and collectively with the October 18, 2004 Meeting, the "October 2004 Meetings"), where they once more voted themselves advancement and indemnification, after trying to fill the gaps in their analysis.[41] In particular, they discussed, in the context of permissive advancement, the ability of the directors to repay any funds advanced to them in the event that it was ultimately determined that the directors, or any of them, are not entitled to indemnification. According to Mr. Higgin, they "arrived at the conclusion that both the assets and

---

**39.** *See* Higgin Decl. ¶¶ 19–26.

**40.** The October 26 Meeting was held after the depositions of Colin Higgin and John, Timothy and Michael Rigas in connection with this motion. (*See* Adelphia Mem. in Further Opp'n at 2.)

**41.** *See* Higgin Second Supplemental Decl. ¶¶ 5, 7–10.

liabilities of the Directors are subject to significant speculation as a result of the criminal and civil actions against the Directors, making it impossible to assess accurately the ability of the Directors to repay at this time."[42] They also "noted" that advancement would allow the Directors to better defend the claims against the Managed Entities and preserve the assets, and that without advancement the assets would likely be impaired. They "concluded" that despite the "uncertainty" surrounding the Directors' ability to repay, advancement was "in the best interests of the Managed Entities" because it would ostensibly "serve to protect and preserve the assets of the Managed Entities."[43]

The Court assumes that words to that effect were uttered by one or more of the people at the meeting. However, the Court is not in a position to find that the stated views had any reasonable basis in fact, and indeed is required to find, and does find, exactly to the contrary. The highly evasive testimony of James Rigas in this respect,[44] with a stated inability to recall events less than 30 days before, was wholly unconvincing. The liabilities of the Rigases, if they were to lose in even one of the many major actions pending against them, would not be subject to "speculation." They would, as a matter of high probability or near certainty, be enormous—far in excess of the ability of any of the Rigases to repay the advances, especially in light of the billions of dollars of so far unsatisfied debt obligations of Adelphia that would have to be satisfied before Adelphia equity is of any value at all. By the time of the October 2004 Meetings, jury verdicts against John and Timothy

Rigas had already been handed down, and the Government had announced its intention to seek civil forfeiture, of sums that could go into the billions. The same factors that, if established, would deprive the Rigases of the right to indemnification (and thus require repayment) would make it impossible for any advancements to be repaid.

Likewise, the Court agrees with Adelphia, and finds, that (at least with respect to John and Timothy Rigas) it was "surreal and imaginary" for the Rigases to conclude that after a jury verdict, there was "no reasonable cause to believe that they had acted illegally."[45]

The Court further finds that the advancement decision could not in any reasonable way be found to "preserve the assets" of the Managed Entities, and can only be regarded as a means to preserve the assets of the *Rigases,* and as a use of the asserted interests of the Managed Entities as a means for the protection of the *Rigases'* concerns.

At the risk of stating the obvious, each of the Rigases voting themselves advancement and indemnification had a direct personal interest in the outcome of the votes, and the authorizations for advancement and indemnification were self-dealing transactions. None of the resolutions was passed on by disinterested directors. And the Rigases voted themselves their advancement at a time when the Managed Entities were not paying interest on the co-borrowings debt, and lacked the ability to pay their debts as they came due.

Prior to the May 2003 Meetings, the Rigases had held 3 meetings of directors

---

**42.** *Id.* ¶ 8. Higgin continued: "For example, a substantial amount of the Directors['] assets are comprised of Adelphia equity and debt securities, the value of which is currently unknown and subject to litigation[.]" *Id.*

**43.** *Id.* ¶ 9.

**44.** *See* 11/22/04 Tr. at 176–81, 189–91.

**45.** *See* 11/22/04 Tr. at 389.

of the Managed Entities in the prior 15 years, most recently in the early 1990s. While the Rigases have held 4 meetings of the Managed Entities in the past 18 months—all to vote themselves advancement and indemnification—they have not held any other meetings of the Managed Entities in the last 10 years.

The Court necessarily must find, and does find, that, as Adelphia has argued,[46] the Rigases were not interested in true deliberation; they simply wanted the advancement and indemnification, and followed the script their attorneys provided to get it.

## D. Available Funds

As noted above, the evidence that was submitted on the Managed Entities' cash flow was proprietary and confidential. The Court made findings as to the appropriate methodology for determining sufficient cash flow, and provided it to the parties by separate decision (on the record and under seal), with directions to the parties to run the numbers and come back to the Court if further issues need to be determined. Subject to the outcome of those computations, it appears that the Managed Entities could meet their obligations without tapping Adelphia itself. In any event, as noted below, the Court will insist upon it.

## E. Relevant Statutory Provisions and Bylaws

As predicates for the analysis that follows, the Court finds the following, as mixed questions of fact and law, with respect to each of the Managed Entities:

1. *The Delaware Corporations (Highland Carlsbad, Highland Prestige, Highland Carlsbad Operating)*

### a. Advancement

Three of the alleged Managed Entities are Delaware corporations. Two of them—Highland Carlsbad and Highland Prestige—have bylaws providing for obligatory advancement of expenses to the fullest extent permitted by law to each person who, by reason of the fact that he or she is a director or officer of the corporation, was or is a party, threatened to be made a party, or involved in any threatened, pending, or completed action, suit, or proceeding.[47] As a consequence of the obligatory advancement provisions in the bylaws of Highland Carlsbad and Highland Prestige,[48] the boards of directors of those two corporations do not have any discretion in determining whether to advance funds to the Rigases. But Highland Carlsbad and Highland Prestige are holding companies, and are not Managed Entities.[49] And they do not have income from operations of their own. They lack the wherewithal to make payments without receiving upstream loans or dividends from their subsidiaries.

The third alleged Managed Entity that is a Delaware corporation, Highland Carlsbad Operating (which was formerly known as Daniels Cablevision), is both a Managed Entity and an active operating corporation. But its bylaws[50] do not provide for the

---

**46.** Adelphia Mem. in Further Opp'n at 13–14.

**47.** This advancement occurs upon receipt of an undertaking by the director or officer to repay the advanced amount if it is ultimately determined that he or she is not entitled to be indemnified.

**48.** Bylaws of Highland Carlsbad (Higgin Decl. Ex. A1); Bylaws of Highland Prestige (Higgin Decl. Ex. A2).

**49.** *See supra* notes 1, 7.

**50.** Bylaws of Highland Carlsbad Operating (Higgin Decl. Ex. A3).

obligatory advancement of costs. While section 145(e) of the Delaware General Corporation Law permits permissive advancement, this is considered to be an interested transaction and must be performed in compliance with the interested director requirements of section 144 of the Delaware General Corporation Law,[51] and common law requirements for approval of transactions by interested directors.

### b. Indemnification

■ The bylaws of Highland Carlsbad, Highland Prestige, and Highland Carlsbad Operating provide for the obligatory indemnification of their directors to the fullest extent permitted by law.[52] That law— Delaware statutory law[53]—provides for obligatory indemnification of a director or officer named as a party in a proceeding by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise for actual and reasonable expenses incurred to the extent that he has been successful on the merits or otherwise in defense of any action for which indemnification is available.

■ That law—again, Delaware statutory law[54]—also permits permissive indemnification. And as their bylaws *obligate* those three Managed Entities to indemnify to the extent such is *permissible*, indemnification becomes obligatory to the extent that the requirements for permissive indemnification under the statutory and common law of Delaware are satisfied. Under Delaware law, a corporation may indemnify a director or officer if he acted in good faith, in a manner that the director reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that the director's conduct was unlawful.[55] Thus (assuming that other requirements have been satisfied), this Court can mandate indemnification from one of those entities to the extent, but only the extent, that it can find that the requirements of § 145(a) have been met.

Because such findings with respect to John and Timothy Rigas would now be premature as a matter of law, and because, at the time of the entry of convictions on the jury verdict the Court would be required to find exactly the opposite, the Court is not in a position to make those findings now.

### 2. The Pennsylvania Corporations (Bucktail Broadcasting, Coudersport Television)

#### a. Advancement

Two others of the alleged Managed Entities—Bucktail Broadcasting and Coudersport Television—are Pennsylvania corporations. Their bylaws,[56] like those of Highland Carlsbad Operating, provide for obligatory advancement of expenses to the full extent not prohibited by law to each

---

**51.** Del. Gen. Corp. Law §§ 144, 145, Del. Code Ann. tit. 8, §§ 144, 145.

**52.** Bylaws of Highland Carlsbad (Higgin Decl. Ex. A1); Bylaws of Highland Prestige (Higgin Decl. Ex. A2); Bylaws of Highland Carlsbad Operating (Higgin Decl. Ex. A3).

**53.** Del. Gen. Corp. Law § 145(c), Del.Code Ann. tit. 8, § 145(c).

**54.** Del. Gen. Corp. Law § 145(a), Del.Code Ann. tit. 8, § 145(a).

**55.** *Id.*

**56.** Bylaws of Bucktail Broadcasting (Higgin Decl. Ex. A4); Bylaws of Coudersport Television (Higgin Decl. Ex. A5).

person who was or is made a party to, threatened to be made a party to, or is otherwise involved in any threatened, pending, or completed action, suit, or proceeding.[57] The boards of directors of the two corporations do not have any discretion in this matter.

### b. Indemnification

■ The bylaws of Bucktail Broadcasting and Coudersport Television provide for the obligatory indemnification of their directors to the full extent not prohibited by law.[58] That law—Pennsylvania statutory law [59]—provides for obligatory indemnification of a director or officer against expenses actually and reasonably incurred to the extent that he has been successful on the merits or otherwise in defense of an action or proceeding.

### 3. The Georgia Corporation (Prestige Communications)

#### a. Advancement

Another of the Managed Entities—Prestige Communications—is a Georgia corporation. Its bylaws [60] do not provide for obligatory advancement. They do, however, provide for permissive advancement upon the receipt of a written affirmation from the director that he acted in a manner that he believed in good faith to be in or not opposed to the best interests of the corporation, and, in the case of a criminal proceeding, had no reasonable cause to believe that his conduct was unlawful.

### b. Indemnification

The bylaws of Prestige Communications provide for obligatory indemnification of a director to the extent that he has been successful on the merits or otherwise in defense of a proceeding to which he was a party because he was a director of the corporation.[61]

The bylaws of Prestige Communications also provide for permissive indemnification when a director's behavior meets the requisite standard.[62] The standard established in those bylaws—one almost identical to the standard embodied in Georgia statutory law [63]—requires that the director acted in a manner he believed in good faith to be in or not opposed to the best interests of the corporation. The standard further requires that in the case of a criminal proceeding, the director had no reasonable cause to believe that such conduct was unlawful.

Because such findings with respect to John and Timothy Rigas would now be premature, and because, at the time of the entry of convictions on the jury verdict the Court would be required to find exactly the opposite, the Court is not in a position to make those findings now.

### 4. The California Corporation (Desert Hot Springs)

#### a. Advancement

Another of the Managed Entities—Desert Hot Springs—is a California corpora-

---

**57.** The person seeking indemnification must request this advancement from the corporation, stating in reasonable detail the expenses that he or she incurred and must provide the corporation with an undertaking.

**58.** Bylaws of Bucktail Broadcasting (Higgin Decl. Ex. A4); Bylaws of Coudersport Television (Higgin Decl. Ex. A5).

**59.** 15 Pa. Cons.Stat. Ann. § 1743 (2004).

**60.** Bylaws of Prestige Communications (Higgin Decl. Ex. A6). In addition, receipt of an undertaking is required.

**61.** *Id.*

**62.** *Id.*

**63.** Ga.Code Ann. § 14–2–851.

tion. Neither California statutory law nor Desert Hot Springs' bylaws [64] provides for obligatory advancement.

■ But California law permits discretionary advancement. Under California statutory law,[65] a corporation can advance expenses incurred in defending any proceeding before final disposition upon receipt of an undertaking.

### b. Indemnification

■ The bylaws of Desert Hot Springs provide that a corporation shall have the power to indemnify an agent of the corporation as provided in California General Corporation Law.[66] California law provides for obligatory indemnification when its requirements have been satisfied. Under California statutory law,[67] a director or officer shall be indemnified against reasonable expenses where he or she is successful on the merits in defense of a proceeding or claim.

■ California law also provides for permissive indemnification. Under California statutory law,[68] a corporation may indemnify a director who was or is a party or is threatened to be made a party to a proceeding if that director acted in good faith and in a manner that the director reasonably believed to be in the best interests of the corporation. If indemnification

is sought with respect to a criminal proceeding, the director must have had no reasonable cause to believe that his conduct was unlawful.

### 5. The Colorado Corporation (Cablevision Business Services)[69]

#### a. Advancement

■ Another Managed Entity—Cablevision Business Services—is a Colorado corporation. Colorado law does not provide for obligatory advancement, but it does provide for permissive advancement. Under Colorado statutory law,[70] expenses may be advanced to a director or officer if he furnishes to the corporation a written affirmation of his good faith belief that his conduct was in good faith. In addition, the director must affirm that he reasonably believed that, in the case of conduct in an official capacity with the corporation, such conduct was in the corporation's best interests, and in all other cases, such conduct was at least not opposed to the corporation's best interests. If advancement is sought with respect to a criminal proceeding, the director must affirm that he had no reasonable cause to believe that his conduct was unlawful.[71] Finally, a determination must be made that the facts that are then known to those making the determination to advance funds would not preclude indemnification under the law.

---

64. Bylaws of Desert Hot Springs (Higgin Decl. Ex. A7).

65. Ann. Cal. Corp.Code § 317(f).

66. Bylaws of Desert Hot Springs (Higgin Decl. Ex. A7).

67. Ann. Cal. Corp.Code § 317(d).

68. Ann. Cal. Corp.Code § 317(b).

69. The bylaws of Cablevision Business Services are conspicuously missing from Composite Exhibit A of the Higgin Declaration, submitted by the Rigases, which includes the

bylaws, partnership agreements, and operating agreements of the other 15 alleged Managed Entities. In addition, the bylaws of Cablevision Business Services are not listed in the chart incorporated in the Higgin Declaration (see Higgin Decl. ¶ 10), which serves as a table of contents for Composite Exhibit A.

70. Colo.Rev.Stat. Ann. § 7–109–104 (2004) (referring to Colo.Rev.Stat. Ann. § 7–109–102 (2004)).

71. Also, the director or officer must furnish a written undertaking to repay the advancement if it is ultimately determined that he did not meet the requisite standard of conduct.

### b. Indemnification

■ Colorado law provides for obligatory indemnification when its requirements have been satisfied. Colorado statutory law [72] provides for obligatory indemnification of a director who was wholly successful on the merits or otherwise in defense of any proceeding against reasonable expenses incurred by the director in connection with the proceeding.

■ Colorado law also authorizes permissive indemnification. By statute,[73] a Colorado corporation may indemnify a director against liability incurred in a proceeding if the director's conduct was in good faith. Also, the director must have reasonably believed that, in the case of conduct in an official capacity with the corporation, such conduct was in the corporation's best interests, and in all other cases, such conduct was at least not opposed to the corporation's best interests. Where indemnification is sought with respect to a criminal proceeding, the director must have had no reasonable cause to believe that his conduct was unlawful.

### 6. The North Carolina Corporation (Henderson CATV)

#### a. Advancement

■ Another Managed Entity— Henderson CATV—is a North Carolina corporation. Neither North Carolina law nor the bylaws of Henderson CATV [74] provides for obligatory advancement. However, North Carolina statutory law [75] provides for the permissive advancement of expenses incurred in defending a proceeding as authorized by the board of directors

upon receipt of an undertaking by or on behalf of the director to repay the amount advanced unless it is ultimately determined that the director is entitled to indemnification by the corporation.

#### b. Indemnification

■ The bylaws of Henderson CATV are silent with respect to indemnification.[76] However, North Carolina statutory law [77] provides for obligatory indemnification of a director against reasonable expenses incurred in connection with a proceeding where he was wholly successful, on the merits or otherwise, in the defense of the proceeding.

■ North Carolina law also authorizes permissive indemnification. Its statutory law [78] permits indemnification of a director against liability incurred in a proceeding if he conducted himself in good faith. Also, the director must reasonably believe that, in the case of conduct in his official capacity with the corporation, such conduct was in the corporation's best interests, and that in all other cases, such conduct was at least not opposed to the corporation's best interests. Where indemnification is sought with respect to a criminal proceeding, the director must have had no reasonable cause to believe that his conduct was unlawful.

### 7. Pennsylvania Limited Partnerships (Adelphia Cablevision–Radnor, Highland Video, Montgomery Cablevision)

#### a. Advancement

Three of the alleged Managed Entities—Adelphia Cablevision–Radnor,

---

72. Colo.Rev.Stat. Ann. § 7–109–103 (2004).

73. Colo.Rev.Stat. Ann. § 7–109–102 (2004).

74. Bylaws of Henderson CATV (Higgin Decl. Ex. A8).

75. N.C. Gen.Stat. Ann. § 55–8–53.

76. Bylaws of Henderson CATV (Higgin Decl. Ex. A8).

77. N.C. Gen.Stat. Ann. § 55–8–52.

78. N.C. Gen.Stat. Ann. § 55–8–51(a).

Highland Video, and Montgomery Cablevision—are Pennsylvania limited partnerships. None of their partnership agreements [79] provides for obligatory advancement. However, all of them provide for the permissive advancement of costs and expenses incurred in defending or responding to any pending or threatened proceeding upon receipt of an undertaking.

▮ Likewise, Pennsylvania law authorizes permissive advancement. Under Pennsylvania statutory law,[80] expenses incurred by a partner in defending any action or proceeding for which indemnification is available may be paid in advance of the final disposition of such action or proceeding upon receipt of an undertaking.

### b. Indemnification

The partnership agreements of each of Adelphia Cablevision–Radnor, Highland Video, and Montgomery Cablevision provide for obligatory indemnification when their requirements are satisfied.[81] When their requirements are satisfied and exceptions are inapplicable, each provides for the obligatory indemnification of the general partner and each partnership employee or agent in connection with a proceeding based on actions taken or omitted to have been taken relating to the organization, business, or other affairs of the part-

nership. Indemnification is not available, however, for an action that is determined to constitute willful misconduct, gross negligence, or a material breach of the partnership agreement with respect to the matter or matters as to which indemnity is sought.

### 8. Delaware Limited Partnerships (Hilton Head, Ionian Communications)

#### a. Advancement

Two other alleged Managed Entities—Hilton Head and Ionian Communications—are Delaware limited partnerships. Neither of their partnership agreements [82] provides for the advancement of expenses. And as the Rigases recognize,[83] and Adelphia seemingly agrees, the Delaware statutes are silent concerning a partner's right to the advancement of expenses.

#### b. Indemnification

When exceptions are inapplicable, the partnership agreements of Hilton Head and Ionian Communications provide for obligatory indemnification of a partner against losses, damages, expenses, judgments, and amounts paid in settlement actually and reasonably incurred by or in connection with a claim, action, suit, or proceeding related to the partner's actions or activities on behalf of the partnership.[84] However, they further provide, as excep-

---

**79.** Partnership Agreement of Adelphia Cablevision–Radnor (Higgin Decl. Ex. A9); Partnership Agreement of Highland Video (Higgin Decl. Ex. A10); Partnership Agreement of Montgomery Cablevision (Higgin Decl. Ex. A11).

**80.** 15 Pa. Cons.Stat. Ann. § 8510 (2004).

**81.** Partnership Agreement of Adelphia Cablevision–Radnor (Higgin Decl. Ex. A9); Partnership Agreement of Highland Video (Higgin Decl. Ex. A10); Partnership Agreement of Montgomery Cablevision (Higgin Decl. Ex. A11).

**82.** Partnership Agreement of Hilton Head (Higgin Decl. Ex. A12); Partnership Agreement of Ionian Communications (Higgin Decl. Ex. A13).

**83.** See Rigas Mem. of Law (Adv. Pro. ECF # 289) at 32.

**84.** Partnership Agreement of Hilton Head (Higgin Decl. Ex. A12); Partnership Agreement of Ionian Communications (Higgin Decl. Ex. A13).

tions to that general rule, that no such person can be indemnified for actions constituting bad faith, fraud, or gross negligence.

### 9. Florida Limited Liability Companies (Adelphia–West Palm, Adelphia–West Palm II)

#### a. Advancement

The last two of the alleged Managed Entities—Adelphia–West Palm and Adelphia–West Palm II—are Florida limited liability companies. Neither's operating agreement[85] provides for the advancement of expenses.

Florida statutory law[86] does not explicitly provide for the advancement of expenses. It does, however, state:[87]

(2) Notwithstanding subsection (1), indemnification or *advancement* of expenses shall not be made ... if a judgment or other final adjudication establishes that the actions, or omissions to act, of [the] member, manager, managing member, officer, employee, or agent [seeking advancement] were material to the cause of the action so adjudicated and constitute any of the following:

(a) A violation of criminal law, unless the member, manager, managing

member, officer, employee, or agent had no reasonable cause to believe such conduct was unlawful.

(b) A transaction from which the member, manager, managing member, officer, employee, or agent derived an improper personal benefit.

(c) In the case of a manager or managing member, a circumstance under which the liability provisions of s. 608.426[88] are applicable.

(d) Willful misconduct or a conscious disregard for the best interests of the limited liability company in a proceeding by or in the right of the limited liability company to procure a judgment in its favor or in a proceeding by or in the right of a member.

#### b. Indemnification

When exceptions to the general rule are inapplicable, the operating agreements of Adelphia–West Palm and Adelphia–West Palm II provide for the obligatory indemnification of members against all costs and expenses resulting from or relating in any way to any action, proceeding, or investigation in connection with the organization, business, or other affairs of the company.[89]

---

**85.** Operating Agreement of Adelphia–West Palm (Higgin Decl. Ex. A14); Operating Agreement of Adelphia–West Palm II (Higgin Decl. Ex. A15).

**86.** Fla. Stat. Ann. § 608.4229 (2004).

**87.** *Id.* (emphasis added).

**88.** Under section 608.426(3), a manager or managing member who votes for or assents to a distribution made in violation of that section, the articles of incorporation, or the operating agreement is personally liable to the limited liability company for the amount of the distribution that exceeds what could have been distributed without such violation if it is established that the manager or managing

member did not perform his duties in compliance with section 608.4225. Section 608.4225 provides that the manager or managing member owes a duty of loyalty and a duty of care to the limited liability company and all members, and that each manager and managing member must discharge his duties to the limited liability company and its members, and exercise any rights, consistent with the obligation of good faith and fair dealing.

**89.** Operating Agreement of Adelphia–West Palm (Higgin Decl. Ex. A14); Operating Agreement of Adelphia–West Palm II (Higgin Decl. Ex. A15).

However, such indemnification shall be made only if the action or omission of such member is not determined to constitute willful misconduct, recklessness, or gross negligence. The determination concerning willful misconduct, recklessness, or gross negligence shall be made by a court of competent jurisdiction or other body before which the relevant action, proceeding, or investigation is pending.

 Florida statutory law[90] provides that subject to the company's articles of organization or operating agreement, a limited liability company may—but is not required to—indemnify any member or manager or other person from and against any and all claims and demands, provided that the member's conduct does not constitute the actions set forth in detail regarding advancement.

## Discussion

### I.

### Standards for Injunctive Relief

 The standards for issuance of a preliminary injunction in this Circuit are well known. To prevail on a motion for a preliminary injunction, the moving party must show: "(a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."[91]

 Where a mandatory injunction is sought, however, a more demanding standard applies. The Second Circuit has held that "[t]he moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo'—i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.'"[92]

 While, as the Second Circuit recognized in Tom Doherty, it is sometimes debatable whether the movant is requesting a mandatory or a prohibitory injunction,[93] here it is clear (and their counsel

---

**90.** Fla. Stat. Ann. § 608.4229 (2004).

**91.** Zervos v. Verizon New York, Inc., 252 F.3d 163, 172 (2d Cir.2001); see also Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 77–78 (2d Cir. 1994); Green v. Drexler (In re Feit & Drexler, Inc.), 760 F.2d 406, 415–16 (2d Cir.1985); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979); In re Netia Holdings S.A., 278 B.R. 344, 352 (Bankr. S.D.N.Y.2002) (Gerber, J.); In re Petition of Caldas, 274 B.R. 583, 597–98 (Bankr.S.D.N.Y. 2002) (Gerber, J.).

**92.** Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996) (citing Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33–34 (2d Cir.1995) ("Tom Doherty")); see also SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir.1998) ("This court has said that the court 'should require a more substantial showing of likelihood of success ... whenever the relief sought is more than preservation of the status quo.'"); Freedom Holdings, Inc. v. Spitzer, 2004 WL 2035334, at *12 (S.D.N.Y. Sept. 14, 2004) (Hellerstein, J.); Great Earth Int'l Franchising Corp. v. Milks Devs., Inc., 302 F.Supp.2d 248, 251–52 (S.D.N.Y.2004) (Haight, J.).

> See also Full House Foods, Inc. v. 33rd Street Enters., Inc. (In re Full House Foods, Inc.), 279 B.R. 71, 76 n. 5 (Bankr.S.D.N.Y. 2002) (Bernstein, C.J.) (commenting that although the debtor was actually seeking a mandatory injunction, for which it would need to show a greater likelihood of success, the defendants had not argued for this higher standard, and thus, the ordinary preliminary injunction standard would apply).

**93.** Tom Doherty, 60 F.3d at 34 ("The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics.

recognizes [94]) that the Rigases are requesting a mandatory injunction, and thus the higher standard must apply. As noted in *Tom Doherty:*

> The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial, or clear showing of, likelihood of success to obtain preliminary relief.[95]

Here, because of the certain or near-certain inability of the Rigases to repay the money that they are requesting—which would make a meaningful remedy to Adelphia impossible, if Adelphia were to prevail—the Rigases must meet the higher standard. Accordingly, the mandatory injunction cases are fully applicable here.

## II.

### *Irreparable Injury*

■ As noted above, the award of an injunction requires a showing of irreparable injury. While the Rigases' motion has a fair number of deficiencies, addressed below, this is not one of them. The Court found the testimony of the Rigases' three criminal defense counsel to be candid and credible, and finds that they have represented their clients sensibly and economically. On the whole, the Court makes a similar finding on the civil side. The Court also finds that a financial inability to defend oneself has serious consequences, and is irreparable. Indeed, this was a major factor in the decision to include a carveout from this Court's second TRO allowing the Rigases to devote assets presently under their control to their legal defense, notwithstanding Adelphia's claims to those assets and Adelphia's claims that those assets are under a constructive trust.

Adelphia contends that if the Rigases were more serious about limiting their expenditures and liquidating and otherwise drawing upon their own assets, the injury to them from a denial of an injunction requiring Adelphia to tap the assets of the Managed Entities would be less severe. Adelphia further contends that even to this day, the Rigases have not been open and candid with respect to their financial resources, in part as a consequence of their invocation of the Fifth Amendment, and in part for less understandable reasons, including an unwillingness to acknowledge, much less change, their lifestyles and their financial spending preferences. Adelphia is right in both of these respects, but it is not clear to this Court that the incremental effect of such measures would be sufficient to fully fund their defense on the many fronts where the Rigases have been charged with misconduct.

The Court determines that the requirement for showing irreparable injury has been satisfied.

## III.

### *The Merits*

However, securing any kind of preliminary injunction also requires a showing of likelihood of success on the merits, or, at

---

Determining whether the status quo is to be maintained or upset has led to distinctions that are more semantic than substantive ... Moreover, many mandatory injunctions can be stated in seemingly prohibitory terms ... Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of status quo.") (internal citations and quotations omitted).

**94.** *See* 11/22/04 Tr. at 388 ("We're in a context of a mandatory injunction, Your Honor. We started and we should end there.").

**95.** *Tom Doherty,* 60 F.3d at 35.

the least, serious issues going to the merits. And where, as here, a mandatory injunction is sought, the movant must meet a higher standard, and must show, as discussed above, a "clear" or "substantial" showing of a likelihood of success.

This Court could focus on the merits in such an interim fashion, of course, but little, if anything, could be shown in further proceedings by way of fact or legal argument that has not already been presented. And the mandate on the remand from Judge Lynch was more specific; he held that "the Bankruptcy Court should have determined whether the Rigases have some legal entitlement to the cashflow of the Managed Entities to pay their personal legal defense costs...." [96] Accordingly, this Court does just that. Of course, determining the Rigases' actual entitlement also determines the extent to which they have the requisite "clear" or "substantial" likelihood of success.

### A. Analysis Overview

The entitlement analysis requires an initial determination of the source of the entitlement—by contractual or statutory right, on the one hand, or as a consequence of resort to corporate governance procedures, on the other. If the former, it requires consideration of distinctions between advancement and indemnification. If the latter, it also requires consideration of the self-interest of the Rigases in authorizing advancement or indemnification of themselves, and of the insolvency of the Managed Entities—matters that require consideration of the "entire fairness" test, and the extent to which it was satisfied here. In each case where advancement or indemnification would otherwise be payable, the Court must consider each Managed Entity's financial wherewithal to make the necessary payments. The Court considers these several matters, rearranged for ease of analysis, in turn.

### B. Advancement v. Indemnification

Advancement and indemnification, in the context of the payment of defense costs, are not the same thing. Indeed, they are "legally quite distinct types of legal rights." [97]

Advancement is a species of loan—"essentially simply a decision to advance credit" [98]—to an officer or director pending later determination of that person's right to receive and retain indemnification. The corporation maintains the right to be repaid all sums advanced, if the individual is ultimately shown not to be entitled to indemnification. [99] Thus, assuming that advancement is not required by contract or by a company's bylaws, advancement involves consideration of the desirability of making the loan, in light of the surrounding circumstances and of the prospects for repayment.

By contrast, indemnification refers to the ultimate obligation of the corporation—not infrequently imposed as a mandatory matter by statute [100] or bylaws—to bear the costs of defense and any

---

**96.** See supra note 26.

**97.** Advanced Mining Sys., Inc. v. Fricke, 623 A.2d 82, 84 (Del.Ch.1992) ("Advanced Mining Sys."); see also Bergonzi v. Rite Aid Corp., 2003 WL 22407303, at *2 (Del.Ch.2003) ("Advancement is a right that the [Delaware] Supreme Court has recognized as distinct from the right to indemnification.").

**98.** Advanced Mining Sys., 623 A.2d at 84.

**99.** Id.

**100.** See, e.g., Del.Code Ann. tit. 8, § 145(c) ("To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person *shall* be indemni-

ultimate fines, settlement, or damages awards, imposed upon an officer or director after a final determination of the merits of the claims asserted against that officer or director.[101] The right to be indemnified for expenses will depend upon factors quite independent of the decision to advance expenses.[102]

Given the different nature of the two corporate acts, and of the considerations underlying each, corporations' duties with respect to advancement, on the one hand, and indemnification, on the other, are not necessarily the same. As noted above, the statutory law of several states, including Delaware, requires corporations to indemnify directors and officers under certain circumstances. But it has been held that because indemnification rights and rights to advancement of possibly indemnifiable expenses are distinct types of legal rights, a bylaw requiring a corporation "to indemnify" does not obligate it "to advance"—or deprive the board of its function to evaluate the corporation's interest with respect to an advancement.[103]

## C. Payment as Matter of Obligation

With respect to each of advancement, on the one hand, and indemnification, on the other, the Court then must consider the extent to which such is obligatory. The Rigases do not claim contractual entitlement to either advancement or indemnification. They do, however, have statutory or bylaws rights in a few instances to advancement, and Michael Rigas (but not the others) has such rights to indemnification—though only with respect to defense costs in his recently completed criminal trial.

### 1. Advancement

As described above in the Court's discussion of the facts, two of the Managed Entities have obligatory duties to advance. The bylaws of Bucktail Broadcasting and Coudersport Television require advancement, and while they condition that duty upon the recipient's *undertaking* to pay the money back if the recipient later is found to be undeserving of indemnification, they do not condition that duty upon the recipient's *ability* to pay it back.

■■■■ However, none of the other Managed Entities has such an obligatory duty, by statute, bylaws, or contract.[104]

---

fied against expenses (including attorneys fees) actually and reasonably incurred by such person in connection therewith.") (emphasis added).

**101.** *Id.*

**102.** *Advanced Mining Sys.*, 623 A.2d at 84.

**103.** *See id.* at 84 ("[T]he question here may be restated to be whether a mandate to 'indemnify' includes an obligation to advance expenses prior to a determination whether indemnification is permitted or required. In my opinion it does not.").

**104.** The Court has found that Highland Carlsbad and Highland Prestige are not Managed Entities. Even if they were, they would not have income or assets from which they could fund advancement, except by receipt of divi-

dends or loans from their subsidiaries, which without dispute are insolvent entities. This Court plainly could not appropriately direct the former; dividends from insolvent entities are classic fraudulent conveyances, and are also prohibited by law. *See Pereira v. The Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings)*, 289 B.R. 548, 561 (Bankr.S.D.N.Y.2003) (Bernstein, C.J.) ("The insolvent corporation cannot make distributions to shareholders, by redemption or dividend . . . ."). For this reason, the Court can quickly answer, in the negative, one of the questions Judge Lynch asked this Court to focus on upon the remand. Given their insolvency, none of the Managed Entities can properly provide any funds to be used for defense costs by way of dividend.

Likewise, loans from insolvent entities, in the absence of an ability to repay the debt—

Claims to advancement from the other Managed Entities can be asserted only on the basis that such is permissive, and that the requirements for *permissive* advancement have been satisfied. (That contention is discussed below.)

### 2. Indemnification

However, as noted above, all of the Managed Entities have bylaws that provide, in substance, for obligatory indemnification (limited to actual and reasonable expenses incurred [105]) for defense costs with respect to specified legal proceedings, after specified outcomes. Their obligatory indemnification obligations vary, but not in ways material to this dispute, and in general have two requirements: (1) The "by reason of" requirement-a nexus between the legal proceeding with respect to which indemnification is sought, and the indemnification recipient's status as a present or past director and officer of the entity that is asked to indemnify; and (2) a successful outcome.

### a. "By reason of" Requirement

 A threshold matter is whether the first requirement has been satisfied here.

Though the relevant statutory and bylaws language differs from one to another of the Managed Entities, the language differences are not material, and it is uniformly the case that even when indemnification is obligatory, it is typically payable only where the recipient person was or is a party (or is threatened to be one) in a proceeding "*by reason of the fact that* the person is or was a director, officer, employee or agent of the corporation . . ." [106] or "*because*" he or she is or was such.[107]

At this juncture, indemnification is on the table only with respect to the criminal trial, due to the requirement for indemnification that proceedings be completed. Satisfaction of the "by reason of" requirement is debatable, as it is at least arguable that the Rigases were indicted and tried principally by reason of the fact that they were directors and officers of *Adelphia* (with the Government having charged principally that they injured *Adelphias* investors, bank and unsecured creditors, and non-insider equity holders), as compared and contrasted to the *Managed Entities*. The claims against them were in essence

an obvious deficiency here—would similarly be fraudulent conveyances. This Court will not direct that any already insolvent entity make a loan that virtually certainly could not be repaid.

**105.** The "actual and reasonable" requirement is not a major issue here, and to the extent it was or could be raised at all, the Court rejects it. The Court finds that the costs by the three criminal defense firms involved—Curtis, Mallet; Morvillo, Abramowitz; and Swidler Berlin—were plainly reasonable, and that given the substantial resources deployed against them, the civil defense lawyers' fees have, on the whole, been reasonable as well.

**106.** *E.g.*, Del. Gen. Corp. Law § 145(a) (emphasis added). It provides in full relevant part:
(a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) *by reason of the fact that the person is or was a director, officer, employee or agent of the corporation,* or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the *person in connection with such action, suit or proceeding. . . .*
Del.Code Ann. tit. 8, § 145(a).

**107.** *E.g.*, Ga.Code Ann. § 14–2–852.

that the Rigases used the Managed Entities simply as *instrumentalities* of their alleged violations of law. And it is even more debatable with respect to the wire fraud charges, as discussed below.

In *Heffernan v. Pacific Dunlop GNB Corp.*,[108] the Seventh Circuit considered the application of the "by reason of" language. In the context of the Delaware statute (though in analysis this Court regards as more broadly applicable), it stated:

> We believe that Delawares "by reason of the fact that" phrase is broad enough to encompass suits against a director in his official capacity as well as suits against a director that arise more tangentially from his role, position or status as a director.[109]

While in *Heffernan*, the Court found indemnification to be required, and implied a fairly flexible standard with respect to suits against a director that "arise more tangentially from his role, position or status as a director," the Court finds that the Rigas activities that were the subject of the wire fraud count fail to meet even the *Heffernan* test.

While, as noted below, the Court comes to different conclusions with respect to ultimate entitlement to indemnification on the part of John and Timothy Rigas, on the one hand, and Michael Rigas, on the other, its analysis with respect to the "by reason of" requirement for each of them is the same.[110] With respect to the wire fraud charges as to which each of John, Timothy, and Michael Rigas was acquitted—in the case of John and Timothy Rigas, the only charges with respect to which they could be entitled to indemnification, and in the case of Michael Rigas, one of several charges for which he would otherwise be entitled to indemnification—those charges involved wire transfers for the purpose of paying margin loans of Rigas-owned entities *other than the Managed Entities*.[111] The wire fraud charges plainly were not against any of the Rigases in their official capacity as officers or directors of the Managed Entities, nor did the wire fraud charges even arise more tangentially from their roles, positions, or status as such. They had nothing to do with the Managed Entities at all. And the fact that Judge Sand held that the wire fraud could be found by the jury to be one or more acts in furtherance of the alleged conspiracy does not mean that the converse is true—that *all* acts in furtherance of the conspiracy therefore relate to the Managed Entities.

Thus, with respect to the matters as to which they were acquitted, the Rigases

---

108. 965 F.2d 369 (7th Cir.1992).

109. *Id.* at 375. *See also West v. Balfour Beatty Constr., Inc. (In re Miller)*, 290 F.3d 263, 267–68 (5th Cir.2002) (holding that a nexus between the corporate officers' or directors' official activity and the matter for which indemnification is sought must be shown, though no more than a nexus; whether a nexus exists is a question of fact to be determined by the trial court considering all the circumstances surrounding the proposed indemnification).

110. Once judgments of conviction are entered on the guilty verdicts against them, John and Timothy Rigas will not be entitled to indemnification with respect to the counts for which they were convicted, as a consequence of the adverse outcome, irrespective of whether or not John and Timothy Rigas satisfy the "by reason of" test with respect to those counts. Thus, although it is at least reasonably arguable that John and Timothy Rigas satisfy the "by reason of" requirement with respect to the conspiracy and securities fraud charges, the Court does not need to reach that issue, as they are not entitled to indemnification in any event, by reason of the adverse outcome on those charges as to them.

111. *See* Carpinello Decl. ¶ 14 and Ex. M thereto.

cannot satisfy the "by reason of" test when seeking payment from the Managed Entities.[112]

The Court finds, as a mixed question of fact and law, that by reason of the number and complexity of the non-wire fraud charges, the importance in defending them, and the need to address many matters for all counts, 10 of the defense costs should properly be regarded as allocable to the wire fraud charges, disqualifying each of John, Timothy, and Michael Rigas from indemnification to which he might otherwise be entitled to that extent.

### b. Successful Outcome

The second requirement for obligatory indemnification is a successful outcome. Here, the Court comes to different results with respect to John and Timothy Rigas, on the one hand, and Michael Rigas, on the other.

#### (i) John and Timothy Rigas

■ Once judgments of conviction are entered on the guilty verdicts against them, and until and unless their convictions on those charges are reversed on appeal, John and Timothy Rigas will not be entitled to indemnification with respect to the counts for which they were convicted, as a consequence of the adverse outcome.

If pressed, the Court would be likely to rule, as Adelphia argues, that John and Timothy Rigas would forfeit their entitlement upon conviction (subject to reinstatement if results in later proceedings warranted it) and not, as the Rigases argue, at the time of appeal. But the Court does not need to reach that issue. On the now-pending requests for a mandatory injunction, this Court will not order indemnification in favor of either John or Timothy Rigas, for any part of their criminal defense costs, at this juncture. It so rules irrespective of whether their claim to indemnification is measured by their *present* entitlement to it (which they now do not have), or by the standard of mandatory preliminary injunction analysis that they have a "clear" or "substantial" showing of a likelihood of success—which in this context means on their criminal appeal (the only thing that can now change their entitlement to indemnification), as to which this Court likewise is not in a position to find that they have a "clear" or "substantial" likelihood of success.[113]

#### (ii) Michael Rigas

■ The Court rules, however, that with the jury having convicted Michael

**112.** The Court has considered, but must reject, the Rigases' contention—which may or may not have been intended to also address weaknesses in their position with respect to the "by reason of" requirement—that because facts underlying the wire fraud charges were part of the Government's claim of one illegal plan, or conspiracy, such satisfies their need to satisfy the "by reason of" requirement when seeking indemnification from one or more of the Managed Entities. The Court agrees with the Rigases that the Government took the position, and Judge Sand ultimately agreed, that the wire fraud charges—even as they were asserted against Michael Rigas—should not be dismissed because acts said to constitute the wire fraud could have been done as part of the general conspiracy that resulted in injury to investors, banks, and Adelphia that the Government alleged to exist. But this is not responsive to the real issue with respect to the "by reason of" requirement—were the wire fraud charges brought against John, Timothy, or Michael Rigas by reason of their status or conduct as officers or directors of the Managed Entities? The answer to that question, in this Court's view, is no.

**113.** Additionally, 7 of the 11 Managed Entities would be excused from duties to indemnify John and Timothy Rigas even for counts for which they were not convicted because they were not wholly successful in their defense, or because they were determined to have engaged in willful misconduct.

Rigas of nothing (having returned not guilty verdicts in his favor on several of the charges, and having been unable to decide the remainder), Michael Rigas is entitled to indemnification (for the 90% of his defense costs that meet the requirements of the "by reason of" rule) from the 11 Managed Entities, even though the Government may retry him on some of the charges.

The statutory laws governing 4 of the Managed Entities, as Adelphia recognizes,[114] require mandatory indemnification where the officer or director is partially successful in that litigation. Such provisions require indemnification *to the extent* that the officer or director is successful, without regard to the culpability or good faith of the officer or director.[115]

While Adelphia correctly observes that similar statutory provisions do not exist with respect to the remaining 7 Managed Entities,[116] the Court concludes that they nevertheless must indemnify Michael Rigas with respect to the now-concluded criminal trial. The issue arises, of course, because the jury "hung"—it could not agree—with respect to some of the counts as to which Michael Rigas was charged, and the Government has announced its

intention to retry him on a subset of those counts. While Michael Rigas was not convicted of anything, he likewise was not acquitted of everything. The Court must thus determine the entitlement to indemnification where the applicable statute does not expressly authorize indemnification "to the extent" the officer or director was successful.

Three of the Managed Entities have exceptions to their indemnification obligations, under the applicable statutes or organizational documents, where the actions of the person seeking indemnification have been "determined" to constitute wrongful conduct of specified types.[117] Here, however, with the jury having acquitted on some counts and having hung on others, there has been no such determination to date. This Court is not in a position now to anticipate that any such determination would be made in the future, or to try to make such a determination at this time itself.

Two other Managed Entities[118] provide in their limited partnership agreements for an exception to obligatory indemnification, stating that "no such Person shall be indemnified for actions constituting bad

---

**114.** Bucktail Broadcasting and Coudersport Television (Pennsylvania corporations), Highland Carlsbad Operating (a Delaware corporation), and Desert Hot Springs (a California corporation). *See* Adelphia Supplemental Mem. in Further Opp'n at 3 n. 1.

**115.** *See Waltuch v. Conticommodity Servs., Inc.,* 88 F.3d 87, 96 (2d Cir.1996) ("*Waltuch*").

**116.** Prestige Communications, Henderson CATV, Highland Video, Adelphia–West Palm, Adelphia West Palm–II, Hilton Head, and Ionian Communications.

**117.** Highland Video, a Pennsylvania limited partnership (indemnification permitted to the

extent that the actions of the person seeking indemnification have not been *"determined* to constitute willful misconduct, gross negligence or breach of a material provision of [the Limited Partnership] Agreement") (emphasis added); Adelphia West Palm and Adelphia–West Palm II, both Florida limited liability companies (indemnification mandatory, "except that such indemnification shall be made only if such action or omission of such Member is not *determined* to constitute willful misconduct, recklessness or gross negligence, with respect to the matter or matters as to which indemnity is sought") (emphasis added).

**118.** Hilton Head and Ionian Communications, both Delaware limited partnerships.

faith, fraud, or gross negligence." [119] But once more, with respect to Michael Rigas, no determination to that effect was made, and the Court is not in a position now to anticipate that any such determination would be made in the future, or to make such a determination at this time itself.

■ But 2 other Managed Entities [120] are Georgia and North Carolina corporations, respectively, whose corporation laws are based on the Model Act. Those statutes require that the indemnified person be "wholly successful." [121] The Court must wrestle with those words, and determine what "wholly successful" means. Does it mean "not convicted of anything," or does it require an acquittal or other final, favorable disposition?

Though the question is close, the Court concludes that "wholly successful" means the former. The expression "wholly successful" is not defined in the Model Act or either Georgia's or North Carolina's version of that statute. But the parties here agree, and the Official Comments make clear, that the requirement of "wholly" was added to the definition of success to deliberately avoid the result reached in a Delaware indemnification case, *Merritt–Chapman & Scott Corp. v. Wolfson.* [122]

There, four agents of a Delaware corporation were charged with several counts of criminal conduct. After a trial which led to convictions that were reversed on appeal, and two retrials that resulted in an acquittal in part, a conviction in part, and hung juries with respect to the remainder, the agents entered into a deal with the prosecutor's office by pleading *nolo contendere* to one of the counts in exchange for the dropping of the rest. The agents claimed entitlement to mandatory indemnification as to the counts that were dismissed. The Delaware court held that they were entitled to partial indemnification with respect to the counts for which they were not convicted. It said, in that regard:

> The statute requires indemnification to the extent that the claimant 'has been successful on the merits or otherwise.' Success is vindication. *In a criminal action, any result other than conviction must be considered success.* Going behind the result, as [the corporation challenging indemnification] attempts, is neither authorized by [Del. Gen. Corp. Law § 145](c) nor consistent with the presumption of innocence.

> The statute *does not require complete success.* It provides for indemnification *to the extent of* success 'in defense of any claim, issue or matter' in an action. Claimants are therefore entitled to partial indemnification if successful on a count of an indictment, which is an independent criminal charge, even if unsuc-

---

**119.** Higgin Decl. Exs. A12, A13.

**120.** Prestige Communications and Henderson CATV.

**121.** *See, e.g.,* the Georgia statute:

> A corporation shall indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which he or she was a party because he or she was a director of the corporation against reasonable expenses incurred by the director in connection with the proceeding.

Ga.Code Ann. § 14–2–852.

**122.** 321 A.2d 138 (Del.Super.Ct.1974) (*"Merritt"*). While fully sensitive to cases instructing the lower courts to consider statutes in accordance with their plain meaning, *see, e.g., United States v. Ron Pair Enters.,* 489 U.S. 235, 242–43, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), the Court feels that it cannot do so here, by reason of the equally plausible means by which "successful" and "proceeding" can be understood. Resort to the Official Comments is, in this Court's view, both appropriate and essential.

cessful on another, related count.[123]

The Model Act rejected the approach that an officer or director could be indemnified "to the extent" he or she was successful, and substituted the requirement, quoted above, that he or she be "wholly successful." It cannot be disputed that the "wholly successful" requirement was a repudiation of the *Merritt* holding.[124] The Official Comment with respect to the mandatory indemnification provision, with its "wholly successful" requirement, stated in full (with the four sentences in that Official Comment having been numbered by this Court, for ease of reference):

> [1] The basic standard for mandatory indemnification is that the director has been "wholly successful, on the merits or otherwise," in the defense of the proceeding. [2] The word "wholly" is added to avoid the argument accepted in *Merritt–Chapman & Scott Corp. v. Wolfson,* 321 A.2d 138 (Del.Super.Ct.1974), that a defendant may be entitled to partial mandatory indemnification if, by plea bargaining or otherwise, he was able to obtain the dismissal of some but not all counts of an indictment. [3] A defendant is "wholly successful" only if the entire proceeding is disposed of on a basis which does not involve a finding of liability. [4] A director who is precluded from mandatory indemnification by this requirement may still be entitled to permissible indemnification under section 8.51(a) or court-ordered indemnification under section 8.54(a)(3).

The close question is whether the Model Act's "wholly successful" requirement

was a repudiation just of the *Merritt* court's narrow result, in the context of the facts then before it (that a defendant could still be indemnified with respect to any dismissed counts, even if found guilty on others), or was also a repudiation of the *Merritt* court's analysis in reaching that result—and particularly a repudiation of the portion that "any result other than conviction must be considered success." [125]

Sentences [2] and [3] may be argued to yield contrary results. Sentence [2] suggests a repudiation of the *Merritt result,* and in particular a repudiation of the notion that an officer or director could be convicted of something (or have entered a plea) and yet be entitled to indemnification. But Sentence [3] suggests that one cannot be "wholly successful" unless the *"entire proceeding"* is disposed of on a basis which does not involve a finding of liability, setting a higher standard. The apparent inconsistency between Sentence [2] and Sentence [3] varies to a fair degree depending on whether one considers "proceeding" to be a particular trial, on the one hand, or the series of trials or other proceedings that could lead to and then follow a hung jury, until all charges are resolved, on the other.

Parsing the language of both the statute itself and the Official Comment, the Court believes that the "wholly successful" requirement should be read as being defeated by a conviction or plea, but not by a hung jury, for several reasons.

First, the Court believes that it should try to read both of Sentence [2] and Sen-

---

**123.** *Id.* at 141 (emphasis added).

**124.** *See* Model Act § 8.52 official comment. *See also* Dir. Off. Liab 4:24 ("[T]he 1974 case of *Merritt–Chapman & Scott Corporation v. Wolfson* was too much for the committee.... The result that indemnification of legal fees connected with all but one of the counts of an

indictment could be obtained by pleading *nolo contendere* to the remaining count was 'not foreseen by the Model Act Committee and not intended' according to committee spokesmen.").

**125.** *Merritt,* 321 A.2d at 141.

tence [3] to give meaning to each, and to harmonize them to the extent possible. Sentence [2] plainly mandates disqualification in the event of a conviction or plea, but it does not mandate disqualification with respect to events that result in neither conviction nor dismissal. Sentence [3] can easily be harmonized with that, if "proceeding" is construed with its more common meaning—a series of events concluded by a trial.

Second, it is true, as the *Merritt* court observed, that in a criminal action, any result other than conviction must be considered success, and that going behind the result is inconsistent with the presumption of innocence. While the states that adopted the Model Act expressed an unmistakable intent that as a policy matter, a conviction or plea should deprive an officer or director of all indemnification, and not just part of it, they did not express an equally clear intent to deprive defendants of the presumption of innocence that they retain with respect to charges as to which the jury could not agree. The drafters of the Official Comment plainly repudiated the notion that a failure as to one count would be separable from a success as to another, but they did not plainly repudiate the separate idea that in a criminal case, any result other than conviction is a "success" in the first place.

Third, a hung jury—an inability of the fact finder to decide—is not a determination at all. Treating a hung jury in the same manner as a conviction, or even as a basis for making the recipient wait for the indemnification until a decision is made on whether or not to retry him, would be inconsistent with the policy in corporate law generally—even in states with indemnification statutes that are not as generous as Delaware's—that directors should be encouraged to serve, with the comfort that they will be indemnified unless they have been found to have acted wrongfully.[126]

Fourth, this conclusion is supported by the Second Circuit's decision in *Waltuch*,[127] even though that decision, as this Court is well aware, involved Delaware law. The *Waltuch* court analyzed *Merritt* in depth, but not so much with respect to *Merritt's* willingness to slice the charges into counts and tolerate partial success as measured by success on some, but less than all, counts (which the Model Act states reject), but rather, with respect to what constitutes "success" in the first place or (in the words of the *Waltuch* district court, and then the Second Circuit) "vindication."[128] The latter issue, of course, is much closer to what we have here. The *Waltuch* court followed the *Merritt* court's approach of refusing to go behind the result or to appraise the reason for the success,[129] and continued:

126. For these reasons, the Court does not have to decide whether the bylaws of Prestige Communications, which (unlike Henderson CATV) provide for indemnification for an officer or director "to the extent that he has been successful," grant rights that are unlawful under Georgia law.

127. *See supra* note 115.

128. Indeed, the Second Circuit took pains to note the distinction, and to indicate that it was withholding judgment as to the former: Our adoption of *Merritt's* interpretation of the statutory term "successful" does not

necessarily signal our endorsement of the result in that case. The *Merritt* court sliced the case into individual counts, with indemnification pegged to each count independently of the others. We are not faced with a case in which the corporate officer claims to have been "successful" on some parts of the case but was clearly "unsuccessful" on others, and therefore take no position on this feature of the *Merritt* holding. *Waltuch*, 88 F.3d at 96 n. 12.

129. *Id.* at 96.

Under *Merritt's* holding, then, vindication, when used as a synonym for "success" under [Del. Gen. Corp. Law] § 145(c), does not mean moral exoneration. *Escape from an adverse judgment or other detriment, for whatever reason, is determinative.* According to *Merritt*, the only question a court may ask is what the result was, not why it was.[130]

Fifth, Sentence [3] in the Official Comment was apparently modified between the time of the 1984 version of the Model Act and the later 1994 version. In 1984, Sentence [3] read, "A defendant is 'wholly successful' only if the entire proceeding is disposed of on a basis *which involves a finding of nonliability.*" (Emphasis added). But as noted above, Sentence [3] now ends "is disposed of on a basis *which does not involve a finding of liability.*" The Court can find no indication of the reasons for the change, but to the extent that the change is meaningful, it supports the Court's interpretation here. The new version contrasts with the earlier one in that it does not require a "finding of nonliability," such as an acquittal or dismissal.

Reasonable people may differ as to the policy desirability of providing for indemnification with respect to proceedings where the jury has hung, but until and unless a legislature says otherwise, this Court is not in a position to rule that a hung jury is tantamount to a conviction, adverse verdict, or plea.

## D. Payment as a Matter of Appropriate Corporate Action

For those Managed Entities where indemnification is not obligatory, the Rigases' entitlement to it rests on the extent to which each of the Managed Entities took the appropriate corporate action to approve it. The Rigases plainly passed the resolutions to vote themselves the money, held the meetings, and (at least ultimately) [131] had discussions with respect to each of the topics that needed to be discussed in order to do so. The issue, however, is whether they complied with other procedural requirements, and the substantive requirements of applicable corporate governance law, when they did so.

As noted above, each of the Rigases voting themselves advancement and indemnification for their own defense costs had a direct personal interest in the outcome of the votes, and the authorizations for advancement and indemnification were self-dealing transactions. None of the resolutions was passed on by disinterested directors.

### 1. "Entire Fairness" Jurisdictions

In Delaware and Pennsylvania (whose law governs 6 of the 11 Managed Entities),[132] where, as here, directors con-

---

**130.** *Id.* (emphasis added).

**131.** The Court is more than a little bit uncomfortable with the fact that at the time that the Rigases' funding requests had originally come up before this Court (by which time only the May 2003 Meetings had taken place), and before Judge Lynch ruled on the appeal and cross-appeal, the Rigases' steps to authorize payment (at least as the record reflects and documents were produced) were materially deficient. The Court is likewise more than a little bit uncomfortable with the way that after the remand, the Rigases held further meetings and had further discussions, enacting resolutions and executing documents such as requests and undertakings, in the heat of battle, after deficiencies in what they had previously done were highlighted in then-ongoing depositions. However, in light of this Court's conclusions with respect to what they ultimately did, the Court does not have to decide how it would deal with these concerns.

**132.** Highland Carlsbad Operating, Hilton Head, and Ionian Communications (Delaware); Bucktail Broadcasting, Coudersport Television, and Highland Video (Pennsylvania).

sidering a transaction are not disinterested and have a personal stake in the outcome, their determination is not entitled to the deference usually given under the "business judgment" rule. Instead they must show the "entire fairness" of the transaction, or that it is "intrinsically fair."[133] As Judge Sweet of the district court in this district observed in *Pereira:*

> When a controlling shareholder or other insider engages in a self-dealing transaction that is not approved by an independent board (acting in accordance with certain standards), the transaction is unlawful unless the proponent thereof carries his burden of justifying it under the Delaware "entire fairness" doctrine.[134]

 The Delaware Supreme Court succinctly explained the "entire fairness" doctrine in *Weinberger:*

> When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain . . . .

The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.[135]

The "burden of proving entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but not invariably, results in a finding of liability."[136] Where directors are voting on advancement to themselves, such a vote is a classic self-dealing transaction, and must satisfy the requirements of the "entire fairness" doctrine.[137]

 As further explained by Judge Sweet in *Pereira*, and in *Solomon*, one of the several Delaware cases upon which Judge Sweet relied, under the "entire fairness" doctrine, a self-dealing transaction must be justified under both elements of "a two-pronged inquiry into the fair process and the fair price of the transaction."[138] Putting it another way, the "entire fairness" doctrine has dual

---

**133.** *See Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1115 (Del.1994); *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983) ("*Weinberger*"); *Solomon v. Armstrong,* 747 A.2d 1098, 1113 n. 39 (Del.Ch.1999), *aff'd,* 746 A.2d 277 (Del.2000) ("*Solomon*"); *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 763–65 (Del.Ch.1986) ("*Colonial Foods*"); *Delta Star, Inc. v. Patton,* 76 F.Supp.2d 617, 632–33 (W.D.Pa.1999) (applying Delaware law); *Pereira v. Cogan,* 267 B.R. 500, 508 (S.D.N.Y. 2001) (Sweet, J.) ("*Pereira*") (applying Delaware law); *Stanger v. Athos Steel and Aluminum, Inc. (In re Athos Steel and Aluminum, Inc.),* 71 B.R. 525, 540–41 (Bankr.E.D.Pa. 1987) (applying Pennsylvania law); where directors or majority shareholders have a self-interest in a transaction, "the business judgment rule does not apply and the burden shifts to the directors to demonstrate that the transaction is intrinsically fair."

**134.** 267 B.R. at 508.

**135.** 457 A.2d at 710. The Court rejects the notion, argued by the Rigases (Rigas Reply Mem. in Further Supp. at 2), that advancement decisions are immune from scrutiny under the "entire fairness" doctrine because they do not involve mergers and acquisitions. The Delaware Supreme Court's statement of the law in *Weinberger,* quoted above, is hardly so limited. For the same reason, the Court rejects the Rigases' curious contention, *id.,* that interested directors are entitled to the presumption of the business judgment rule unless the record "convincingly demonstrates that they breached their fiduciary duties by failing to consider the relevant factors."

**136.** *Pereira,* 267 B.R. at 508 (quoting *Solomon,* 747 A.2d at 1112).

**137.** *See Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.,* 1999 WL 743479, at *18 (Del.Ch.1999); *Havens v. Attar,* 1997 WL 55957, at *13–*14 (Del.Ch.1997) ("*Havens*").

**138.** *Pereira,* 267 B.R. at 508 (citing *Solomon,* 747 A.2d at 1112–13).

components—one procedural and one substantive. As a procedural matter, the court must consider whether the board made the necessary investigation and undertook due deliberation with respect to the decision the board made. As a substantive matter, the court must consider whether the decision is defensible on the merits. Where, as here, the transaction has not been approved by disinterested directors, the ultimate determination of reasonableness must be made by the court.[139]

Here, the Court finds material deficiencies with respect to both prongs of the "entire fairness" doctrine, and particularly the latter. But first, as a preliminary matter, the Court notes the factual context in which both aspects should have been considered by the Rigases, and must be considered by the Court. The Court agrees with Adelphia, as a mixed question of fact and law, that each of the Managed Entities is insolvent. Here, the Managed Entities are not in the "zone of insolvency," or a little bit insolvent. They are hopelessly insolvent. Each is liable on the co-borrowing facilities, and the liabilities of each greatly exceed its assets. Each likewise lacks the ability to meet its obligations as they mature. By reason of cross-default provisions under the co-borrowing facilities, principal and accrued interest have become due under all of them, and the Managed Entities have the ability to pay neither. The Managed Entities also have an unsatisfied liability to pay Adelphia of the balance of $722 million they owed to Adelphia according to Adelphia's books and records as of April 30, 2002—a date upon which the Rigases were still managing Adelphia.

▮▮▮▮▮ Thus, once the Managed Entities became insolvent, the Rigases, in order to meet their continuing fiduciary duties to the Managed Entities, had to remember that the stakeholders of the Managed Entities were no longer solely themselves as equity holders; the stakeholders now included the creditors of the Managed Entities as well. Thus the Rigases, in exercising their corporate governance rights and responsibilities, could not slough off any resulting damage to the Managed Entities and the creditors who would have first claim to the Managed Entities' assets.[140]

With that in mind, the Court necessarily must find fault with the Rigases' votes to

---

**139.** *See Colonial Foods*, 505 A.2d at 764.

**140.** Many courts, including the Second Circuit, this one, and the state courts from which the applicable principles have their origin, have said that when a corporation becomes insolvent or enters into the zone of insolvency, the fiduciary duties of a corporation expand from its stockholders to its creditors. *See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir.1985); *In re Global Crossing Ltd.*, 295 B.R. 726, 745 (Bankr. S.D.N.Y.2003) (Gerber, J.) ("*Global Crossing*"); *In re Adelphia Communications Corp.*, 2003 WL 22316543, at *32 (Bankr.S.D.N.Y. Mar. 4, 2003) (Gerber, J.) (same); *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790–91 (Del.Ch.2004) ("*Production Resources*"); *Geyer v. Ingersoll Publns. Co.*, 621 A.2d 784, 787 (Del.Ch.1992).

While this is a useful shorthand, and plainly identifies a constituency whose needs and concerns must be considered, the more precise formulation is that stated in *Production Resources*—that the directors' obligations are "to the firm itself." 863 A.2d at 791. While directors continue to have the task of attempting to maximize the economic value of the firm, the fact of insolvency "affect[s] the constituency on whose behalf the directors are pursuing that end," and "places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers." *Id.* Where the remaining equity is under water, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority. *Id.*

As the *Production Resources* court explained, the transformation of a creditor

grant advancement and indemnification to themselves, with respect to each of the procedural and substantive prongs.

### a. "Entire Fairness" Doctrine Procedural Deficiencies

 As a procedural matter, in the context of a discretionary advance of defense costs to themselves as officers or directors of the Managed Entities, directors have the duty to consider (1) the potential damages to be paid in the event that the directors are found not to ultimately be entitled to indemnification, (2)

an estimate of attorneys' fees, and (3) the assets of each director to determine whether the directors could pay potential damages and repay litigation expenses.[141] Where advancement is not mandatory, directors also have the duty "to evaluate the *corporations interest* with respect to advancement of expenses,"[142] and where a corporation is insolvent, they have to consider the effect of their determination on creditors.[143] Here, it appears that in 3 of the Rigases 4 meetings to vote themselves advancement, they failed to discuss whether they had the ability to pay back any funds advanced,[144] and failed to consider

into a residual owner does not change the nature of the harm in a typical claim for breach of fiduciary duty by corporate directors. *Id.* at 792. Rather, while creditors would then have standing to assert that the self-dealing directors had breached their fiduciary duties by improperly harming the economic value of the firm (to the detriment of the creditors who had legitimate claims on its assets), no particular creditor would have the right to the recovery; rather, *all* creditors would benefit when the firm was made whole and the firm's value was increased, enabling it to satisfy more creditor claims in the order of their legal claim on the firm's assets. The *Production Resources* court continued:

In other words, even in the case of an insolvent firm, poor decisions by directors that lead to a loss of corporate assets and are alleged to be a[sic] breaches of equitable fiduciary duties *remain harms to the corporate entity itself.* Thus, regardless of whether they are brought by creditors when a company is insolvent, *these claims remain derivative,* with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets.

*Id.* (footnote omitted, emphasis added). It repeated: "Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation." *See also*

James Gadsden, *Enforcement of Directors' Fiduciary Duties in the Vicinity of Insolvency,* 14 Am. Bankr.Inst. J. 16, 16, 47 (2005) (in an analysis apparently prepared just before *Production Resources* came out, expressing the same views, and properly anticipating the clarification *Production Resources* put forth).

This distinction is relevant in many other controversies that come before this and other bankruptcy courts—especially when creditors race to grab at assets for breaches of fiduciary duty when the offense actually is to the estate as a whole (and the estate should be recovering for its creditors as a whole), or where those alleged to have breached fiduciary duties argue that only individual creditors can sue, and not the representative of the company they allegedly injured. However, it is not, strictly speaking, relevant here.

**141.** *See Advanced Mining Sys.,* 623 A.2d at 82–85; *see also Havens,* 1997 WL 55957, at *13–*14 (Del.Ch.1997) (finding advancement improper where directors were conflicted and failed to consider the matters required under *Advanced Mining Sys.* when voting themselves advancement).

**142.** *Advanced Mining Sys.,* 623 A.2d at 85 (emphasis added).

**143.** *See supra* note 140.

**144.** Higgin Dep. Tr. at 22, 98; Timothy Rigas Dep. Tr. at 33, 71; John Rigas Dep. Tr. 95, 106.

the astronomical damages they would face if they were found liable in even one or two of the dozens of lawsuits they faced—and that the very need to repay after an adverse outcome would make it impossible for any of them to do so.[145] And while this deficiency was addressed in the fourth of the meetings (held a few days prior to the evidentiary hearing before this Court, after Judge Lynch had ruled and after these deficiencies were addressed in their pre-hearing depositions), it is obvious to this Court, and the Court finds, that by this time their decision to grant themselves the indemnification was already a foregone conclusion.[146] Consistent with this Courts Findings of Fact,[147] the Court necessarily must agree with Adelphias contention, and find, that the Rigases fourth meeting was called "to fill gaps and to provide a post hac justification for their actions."[148] The Rigases had a need for funding, and the Managed Entities had the resources to be tapped. On this record, the Court cannot find that the Rigases meetings of the Managed Entities and so-called deliberation before voting advancement were anything other than a formality.

The Court further finds a material procedural deficiency as a consequence of the absence of any meaningful discussion of the "good faith" requirement applicable to John Rigas and Timothy Rigas with re-spect to their requests for indemnification, and in particular, their accepting each others affirmations of good faith without discussing their individual guilt or innocence, or the basis for any such good faith belief, after the jury had returned guilty verdicts against them for conspiracy, securities fraud, and bank fraud.[149]

In short, the Court finds the Managed Entities determinations with respect to both advancement and indemnification to be procedurally deficient in numerous respects.

*b. "Entire Fairness" Doctrine Substantive Deficiencies*

With respect to advancement for all defendants, and indemnification for John and Timothy Rigas, the Court finds "entire fairness" to be lacking on substantive grounds as well. It is plain that the Rigases face billions of dollars of claims against them, in dozens of lawsuits. The very factors that would trigger the duty to repay any advances made would make it impossible, or virtually so, for any of the Rigases to pay them. The Higgin testimony[150] that the Rigases' assets-liabilities imbalance in the event of an adverse outcome was said to be a matter of "speculation," and that ability to repay could be addressed by calling it a matter of "uncer-

---

145. It further appears that they did not discuss the fact that the Managed Entities were not paying their obligations under the co-borrowing facilities, and lacked the means to do so (Higgin Dep. Tr. at 113–15). In addition, before voting to upstream dividends from Managed Entities to the alleged Managed Entities that were holding companies, they did not consider the solvency of the entities that were to issue the dividends. (Higgin Dep. Tr. at 113; Timothy Rigas Dep. Tr. at 41).

146. Indeed, the decision had been made in 2003, with minimal corporate formalities or attention to the matters that needed to be considered.

147. *See supra* p. 23.

148. Adelphia Mem. in Further Opp'n at 13.

149. *See* John Rigas Dep. Tr. at 93–95; Timothy Rigas Dep. Tr. at 146–47. Discretionary indemnification would not be foreclosed with respect to Michael Rigas (who has not been convicted of anything), but the issue would be academic because it would be mandatory for Michael Rigas anyway.

150. *See supra* pp. 21–22.

tainty," was, quite frankly, an insult to the intelligence of the Court. No reasonable director could have found any realistic possibility of repayment under the facts we have here. If the Rigases really believed that (which the Court doubts), this Court does not.

Nor is there any basis for the Court to conclude that advancement is in the interests of the Managed Entities. The Court finds the opposite. The Managed Entities have no material interest in defending this adversary proceeding, or any other litigation, on their own. Nor do they have an interest, much less a material one, in motivating or pleasing the Rigases. To the contrary, their role in life, as relevant to this controversy, is merely as an asset in which the Rigases have an interest, and as a conduit that the Rigases allegedly used as part of allegedly wrongful activity—and their role pales in comparison to the Rigases' own needs and concerns. Advancement and indemnification, from any objective point of view—the view this Court applies, when considering substantive "entire fairness"—is *antithetical* to their interest. And since each of the Managed Entities is insolvent, anyone—including this Court—considering the interests of the Managed Entities necessarily must consider the needs and concerns of the Managed Entities' creditors, who have no interest at all in expending millions for the defense of the Rigases, and who, to the contrary, would be prejudiced by the dissi-

pation of Managed Entities' assets that such expenditures would entail.

Finally, "entire fairness" is also substantively lacking with respect to indemnification for John and Timothy Rigas. In light of the jury verdicts against John Rigas and Timothy Rigas, this Court cannot find that either of them acted in good faith. Likewise (as a consequence of the scienter requirement inherent in any criminal verdict), this Court cannot find that either of them had no reasonable cause to believe that his conduct was unlawful. Rather, the Court must find to the contrary. The Court so finds notwithstanding the declarations that each of them executed attesting to his good faith and lack of reasonable cause to believe he was acting unlawfully. Without deciding how it would deal with self-serving affidavits of that character in the absence of a jury verdict necessarily finding to the contrary, the Court finds that the jury verdicts trump the Rigases' statements in that regard.[151]

### 2. Other Jurisdictions

 Neither side has provided the Court with authority addressing the extent to which "entire fairness" doctrine standards would be applied to indemnification by the five Managed Entities organized under California,[152] Georgia,[153] North Carolina,[154] and Florida[155] law. However, provisions in those states disqualifying a recipient from indemnification in the event of

---

**151.** This, of course, reflects a material change in the facts since the time that this Court issued its now-vacated ruling, which preceded the conclusion of the criminal trial. At that time, John and Timothy Rigas were entitled to the presumption of innocence. But after a full and fair opportunity for them to defend themselves (which this Court, by its earlier ruling, effectively financed with measures to provide the Rigases with what Judge Lynch quite fairly described as "the best criminal defense that money could buy," *District Court*

*Opinion*, 2004 WL 2186582, at *13), the jury returned verdicts against them, and post-trial motions were denied by Judge Sand.

**152.** Desert Hot Springs.

**153.** Prestige Communications.

**154.** Henderson CATV.

**155.** Adelphia–West Palm, Adelphia–West Palm II.

"willful misconduct," "bad faith," or fraud would preclude permissive indemnification by any of them to John or Timothy Rigas.

■ Nor has either side provided the Court with authority addressing the extent to which the "entire fairness" doctrine would be applied to advancement by the four Managed Entities in the three states of California, North Carolina, and Florida. In those states, however, the Court must conclude, even in the absence of express authority, that it is inconceivable that any of them would tolerate votes by interested parties voting benefits for themselves and at the expense of their firms where requirements substantially similar to those of the "entire fairness" doctrine had not been satisfied. At least in a situation where a mandatory injunction is requested, and obtaining it requires a showing of a "clear" or "substantial" likelihood of success, and where the requirements of the "entire fairness" doctrine have not been satisfied with respect to either prong, this Court will not order advancement from the Managed Entities organized under the law of those jurisdictions either.

With respect to advancement in Georgia, the Rigases cite *Serv. Corp. Int'l v. H.M. Patterson & Son, Inc.*[156] for the proposition that the Court cannot go behind their self-serving statements and undertakings, even where the jury returned criminal verdicts with respect to two of them, to subject their determination to "entire fairness" doctrine analysis. The Court does not agree, at least under the facts here.

In *SCI*, a derivative suit shareholder plaintiff sued every member of the H.M. Patterson board, personally, and then sought to enjoin the board members' actions in authorizing advancement to defend themselves. (There is no indication that any of them had been charged with anything criminally, much less found guilty of anything.) The trial court denied the requested injunction, and the *SCI* court affirmed. The *SCI* court considered the issue under Georgia's version of the Model Act, and in particular, the Model Act's provisions relating to advancement[157] and a "conflicting interest transaction."[158]

It is indeed true, as the Rigases argue,[159] that the *SCI* court rejected the shareholder plaintiff's contention that where there were no disinterested directors or shareholders to approve the transaction, the advancement then had to be shown to be "fair" to the corporation under the "conflicting interest transaction" provisions of Georgia's version of § 8.61(b).[160] But this Court nevertheless cannot consider *SCI* as authority for issuance of a mandatory injunction pursuant to the Rigases' advancement votes, even for a Georgia corporation like Prestige Communications, for several reasons.

First, there is the procedural context. In *SCI*, the trial court was asked to enjoin the actions by the board in voting the advancement, by reason of the board's failure to make the findings that would be required for a fairness determination. The trial court declined to grant the injunction, and the *SCI* court found no fault

---

**156.** 263 Ga. 412, 434 S.E.2d 455 (1993) ("*SCI*").

**157.** Ga.Code Ann. § 14–2–853, the counterpart to Model Act § 8.53. For ease of reference and understanding, the Court refers to this provision as "§ 8.53."

**158.** Ga.Code Ann. § 14–2–861(b), the counterpart to Model Act § 8.61(b). For ease of reference and understanding, the Court refers to this provision as "§ 8.61(b)."

**159.** Rigas Reply Mem. in Further Supp. at 9–10.

**160.** *See SCI*, 434 S.E.2d at 457–58.

in the trial court's decision—failing to find the "manifest abuse of discretion" that would be required to overturn that decision.[161] But it is a very different thing to argue that a trial court *must* grant a *mandatory* injunction enforcing a decision by directors that it knows to be flawed. The distinction is underscored by a lengthier quotation of the *SCI* court's discussion in that regard, which also disclaimed an intention to impose a universal rule. The *SCI* court stated:

> [W]e note that our holding should not be construed as saying that under *all* circumstances the trial judge would be powerless to enjoin an advancement by a corporation to its directors. However, on the facts in the record, on which the trial court based its finding that the directors met the requirements of OCGA § 14–2–853 (thus encompassing SCI's challenge to both the reasonableness of the expenses and the directors' good faith belief that they had acted in a manner which was in or not opposed to the best interests of Patterson), SCI has not shown the manifest abuse of discretion required before this court will overturn a denial of interlocutory injunctive relief.[162]

Second, there is the timing context. The *SCI* decision was driven, in material part, by the fact that there (as in many advancement decisions), there would be no basis for a board to form any view as to the merits of the claims against directors.

In *SCI*, the trial court considered the advancement vote under circumstances (like those which this Court had earlier, but which no longer are the case) where there was no indication that the directors had done anything wrong. Here and now, however, the jury has returned criminal guilty verdicts with respect to two of the Rigases. The earlier decisions this Court made, before the criminal convictions, can be analogized to the trial court decisions the *SCI* court affirmed, but that analogy is no longer appropriate.

 Third, the Rigases themselves recognize that their actions must nevertheless satisfy the requirements of the business judgment rule.[163] In three published decisions,[164] and countless unpublished ones, this Court has noted the standards applicable to an exercise of business judgment standards in this Circuit and district, most notably as articulated by Chief Judge Mukasey of this district in *Integrated Resources*.[165] As described in *Integrated Resources*:

> [T]he business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing when the following elements are present: "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets."[166]

---

161. *Id.* at 459.

162. *Id.* (internal quotation marks deleted).

163. *See* Rigas Reply Mem. in Further Supp. at 9–10 ("As a result, interested director decisions are entitled to the business judgment rule.... Accordingly, in Georgia ... the decision of the Directors to advance expenses is entitled to the protection of the business judgment rule-not the entire fairness test.").

164. *Global Crossing*, 295 B.R. at 743; *Adelphia*, 2003 WL 22316543, at \*30–\*31; *In re Adelphia Communications Corp.*, 2004 WL 1634538, at \*2 (Bankr.S.D.N.Y. June 22, 2004).

165. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y.1992) (Mukasey, C.J.) (*"Integrated Resources"*).

166. *Id.* at 656.

This Court has regularly applied the *Integrated Resources* standards, stating, in that connection, that it regularly considers the fifth factor as well.[167] Here the Court is not in a position to find that the business judgment rule has been satisfied. While *SCI* indicates that, at least in Georgia, the "disinterestedness" factor should not be applicable under these circumstances, the Court here must find, based on an actual record made before it (and not based on contentions that a record should have been made, but was not), that the Rigases nevertheless fail the "due care" requirement (with respect to 3 of the 4 meetings, for failure to consider ability to repay at all, and in the fourth meeting, for disingenuous determinations in that regard); the "good faith" requirement (for putting their own needs ahead of those of the Managed Entities, and for reaching the same result without meaningful regard for the criminal convictions); and the "abuse of discretion" and "waste of corporate assets" requirements (by reason of the foregoing and the resulting damage to the Managed Entities and detriment to the creditors of those entities).

This case, then, is dramatically different from one, like *SCI*, where a derivative plaintiff wishes to enjoin directors from their ability to defend themselves by suing all of them at once, under circumstances where there is no indication that any have done anything wrong or that tapping their corporation for their defense would be damaging to the corporation and constituencies to whom they owe their duties.

### E. The Claim to Expense Costs for the Managed Entities Themselves

The Rigases have also argued that the Court should order advancement to

address the stated need of the Managed Entities themselves—as contrasted to the Rigases—in defending this adversary proceeding. The Court disagrees.

The Managed Entities have been named in this adversary proceeding principally or entirely as nominal defendants. The real issue in this case, as far as the Managed Entities are concerned, is who will ultimately own the Managed Entities. And the real parties-in-interest in this case, on the defendant side, are not the Managed Entities, but rather the Rigases themselves. The Managed Entities have little, if any, interest in defending this litigation, and have no interest whatever in spending tens of millions of dollars of their own assets to defend claims principally or entirely for the benefit of the Rigases.

As a result, the Court will not authorize or direct defense payments to be made by the Managed Entities by reason of the argument that "they need to defend themselves." More fundamentally, the Court will not allow the status of the Managed Entities to be used as a back-door means to direct the payment of defense costs for the Rigases' benefit that would not otherwise be payable.

### F. Other Defenses

The Court briefly addresses other points that have been made by one or another of the two sides in this controversy.

#### 1. Violation of the Co-borrowing Agreements

Adelphia points out that expenditures of the types requested here would violate the

---

**167.** *See Adelphia*, 2004 WL 1634538, at *2 ("I consider whether the proposed action (1) represents a business decision; (2) is made with disinterestedness; (3) due care; (4) good faith; and (5) does not constitute an abuse of discretion or waste of corporate assets. (The last standard is one required by some courts and commentators. Without determining whether it should be applied, it is my practice to consider it.)").

Managed Entities' covenants to the banks under the Co-borrowing Agreements. The Court accepts that as true, but that is not Adelphia's water to carry. Such a limitation is the banks' issue to raise, or waive.[168]

### 2. Ceded Management Control

■ Adelphia further argues that as a consequence of a settlement reached on the August 2003 Appeals, under which Adelphia agreed to permit $15 million to be taken from the Managed Entities in exchange for a right to exercise management control over them, the Rigases ceded control over the subject matter of this motion to Adelphia, which has the sole power to make the decision as to whether payment by the Managed Entities is in their "best interests," and, presumably should be made. The Court continues to feel, as it did before,[169] that Adelphia's management powers cannot be stretched that far. Under any fair reading, power was granted to Adelphia for day-to-day control—not for any matter whatever. And as matters become more and more out of the ordinary course, they become less and less subject to the authority so granted. The Court cannot find, by lack of express reference in the September 2, 2003 Stipulation to this issue, that the Rigases ceded the right to be heard on the matter, especially given their reservation of rights to seek modification of the Court's earlier funding orders.[170]

The matters that are the subject of the advancement and indemnification controversy are about as far from "ordinary course" as any that the Court could imagine, and the grant of power to Adelphia to decide such matters under its management authority is much too dramatic (and draconian) to lightly infer. Adelphia cannot avoid judicial scrutiny by contending that the Rigases' grant of management control vested Adelphia with the power to act unilaterally with respect to the matters at issue here.

### 3. "Reasonable" Costs

Adelphia points out that any advancement, and especially indemnification, should be for costs only to the extent they are reasonable. Adelphia is correct in this respect, but ultimately Adelphia's point is academic here. The Court finds that the underlying defense costs, considering the complexity of the issues and the amounts at stake, have been reasonable.

### 4. Resort to Other Assets

Adelphia also argues that the Rigases continue to be secretive with respect to their other available assets; have received and pocketed material sums (such as $475,000 from D & O policy coverage); have unilaterally made decisions as to their spending priorities (such as decisions not to tap investment funds and the cash value of life insurance); and have continued with

---

168. The Managed Entities' insolvency, however, is quite another thing. The banks are not the Managed Entities' only creditors, and the fiduciary duties to the Managed Entities (and to the creditors, including non-bank creditors, who have a residual interest in the Managed Entities' value) cannot be waived by the banks.

169. The Court notes that Judge Lynch did not reverse this Court with respect to that point, if indeed Adelphia argued error in this respect at all.

170. *See supra* note 22 ¶ 13 ("Except to the extent it would expressly contradict a provision of this Stipulation and Order, the parties' rights to challenge the continuation of any TRO or injunction or the right of Adelphia, the Creditors' Committee, the Official Committee of Equity Holders ('Equity Committee'), the pre-petition lenders or the Rigases to seek further relief in connection therewith are not prejudiced.").

lavish lifestyles (such as Timothy Rigas's continued membership in two expensive golf clubs). Adelphia's points are well-taken, and as the Court hears more of them (with new facts having come out in recent discovery), the Court's frustration with them (which it had previously expressed, on a lesser showing) has increased. But as annoying as these matters are, the Court does not believe that they would be sufficiently material, in the whole scheme of things, to conclude that the Rigases do not have a need for considerable funds for their defense. The Court believes it more appropriate, accordingly, to focus its decision on the Rigases' lack of substantive entitlement to the funds of the Managed Entities that they voted to appropriate for themselves, and the failures of corporate governance that this Court has discussed above.

has determined the computational principles that will determine whether the 11 Managed Entities have sufficient cash flow to indemnify Michael Rigas, and whether Bucktail Broadcasting and Coudersport Television can advance for the Rigases generally.[171] At this juncture, it appears that the Managed Entities can make the payments this Court determined should be made without tapping Adelphia itself. In any event, the Court will insist on that.

The parties have been directed to confer with respect to the underlying figures, given the principles the Court laid down, and to determine the amounts that would then be payable. The Court will direct payment to that extent, subject to any claims of setoff for any amounts previously overpaid. Parties' rights to be heard with respect to any controversy in that regard will be reserved.

## IV.

### Available Funds

This Court had previously determined that it would not direct Adelphia to spend any of its own funds for the Rigases' defense, and neither side has quarreled with this view. Judge Lynch reiterated the importance of this point, and directed this Court to determine the extent to which the Managed Entities could fund the amounts requested out of their own cash flow.

The Court has done so—though, to avoid disclosing proprietary information in this public decision, it has briefed the parties separately (on the record, but under seal) with respect to its computations, and will be generalized in its conclusions here. After having reviewed the individualized cash flow of the Managed Entities, the Court

## V.

### Return of Funds

Adelphia argues that the funds previously advanced under this Court's order before Judge Lynch's ruling should be returned. Adelphia's request raises several issues: its standing to secure such relief; to whom the money should be returned; and the means by which the Court should implement the request if it is otherwise granted. Adelphia's points also give rise to issues with respect to setoff, and the extent to which the Court should be directing further advances (or indemnification, for that matter) to the extent any recipient already has been overpaid.

In a recent conference call (at which the Court advised the parties of its "bottom line" determinations on the motion and

---

**171.** These include the principles that outgoing capital expenditures must be regarded as a charge against available cash flow, and that amounts already paid by the Managed Enti-

ties as advancement must likewise be charged against the cash flow that would otherwise be available.

remand), the Rigases took the position that Adelphia lacks standing to ask for repayment. With this Court having previously granted the Rigases' funding request, over Adelphia's opposition, in this adversary proceeding, and with Adelphia having prevailed on this aspect of the appeal before Judge Lynch, this Court has considerable difficulty seeing how the Rigases can argue that Adelphia now lacks standing to be heard with respect to corrective measures to fully implement the letter and spirit of Judge Lynch's ruling and this Court's determinations on the remand. But at the Rigases' request, the Court agreed to give the Rigases further opportunity to be heard with respect to this issue. The Court will honor its commitment in that regard.

The second issue—to whom the money should be returned—is straightforward. This Court's earlier order required payment from the Managed Entities. If, as now appears to be the case, the Managed Entities paid the Rigases' defense costs based on a now-vacated determination by this Court, the appropriate remedy is a return of the funds to the same entities that paid them. Of course the money would not go to Adelphia—which, at least in substance, is pursuing the claims derivatively on behalf of the Managed Entities whose funds were improperly tapped.

 The third issue—the nature of any curative relief—is equally straightforward. The presumption, in the federal courts, is for monetary obligations to be enforced by entry of a monetary judgment (and, if necessary, execution thereon), and not by contempt. Exceptions to that rule are ordered only under exceptional circumstances.[172] While Adelphia caused the Managed Entities' funds to be paid to the Rigases under an injunction which, if not complied with, could have subjected Adelphia to liability for contempt, the fact that Adelphia did so is not, by itself, a sufficient basis for directing that any repayment obligation likewise be enforceable by contempt. And bankruptcy judges are particularly wary of ordering monetary payments to be made under penalty of contempt, especially if ability to pay is potentially at issue.

Accordingly, a direction to return improperly paid fees will be enforceable by entry of a monetary judgment, to be enforced by writ of execution, if necessary, and not contempt. The Court thinks that it has considered any and all impediments to entry of judgment for a return of funds now determined to have been inappropriately advanced, other than determination of the exact amounts due, and that entry of a judgment would be appropriate at the time the exact amounts due are fixed and John and Timothy Rigas are sentenced. But the Court cannot quite be sure that it has already considered all relevant matters. While the Rigases have already been heard as to this,[173] the Court will provide

172. Fed. R. Bankr.P. 7069 makes Fed. R.Civ.P. 69(a) applicable in adversary proceedings. The latter provides that "[p]rocess to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise." While that language appears to contemplate a means to enforce money judgments by other means, "such other means are confined only to cases in which established principles warrant equitable relief, such as when execution would be an inadequate remedy. For example, enforcement through the imposition of a contempt sanction would not be authorized absent exceptional circumstances." 13 Moore's Federal Practice § 69.02 (Matthew Bender 3d ed.2005).

173. *See* Rigas Supplement to Mot. ¶ 7 ("[Counsel for Adelphia] argues in his September 15th letter to the Court that, 'upon the sentencing' of John and Timothy Rigas, all funds advanced to them by the Managed Entities must be returned. This argument is, of

the Rigases with one more opportunity to be heard before entry of judgment. The Rigases may, if they wish, make a further submission with respect to entry of judgment for the repayment of the sums previously paid, to which Adelphia will of course have the opportunity to respond.

By the same token, since the Rigases are asking for a mandatory injunction requiring further payment, Adelphia is entitled to be heard with respect to overpayment already made as a potential setoff to that obligation. Adelphia will have that opportunity, but the Court considers it more appropriate to defer consideration of setoff and related issues until such time as the amounts that otherwise would be paid have been fixed, along with the amount of available cash flow, and the extent, source, and recipients of any overpayment.

## VI.

### Conclusion

On several occasions earlier in this case, this Court emphasized that it would not let its TROs impair the Rigases in their defense of the matters before them, lest its TROs give rise to a self-fulfilling prophecy. And though the Court is not in a position to bless the Rigases' efforts to extract defense costs funding from the Managed Entities, those earlier views have not changed. But this proceeding is no longer about court imposed limitations on how much the Rigases can spend, or for what, under the *prohibitory* injunctions this Court put in place when it issued the TROs. Rather, it is—consistent with the mandate on the remand—about whether the Rigases have made the case for a *mandatory* injunction, when they are asking this Court to require Adelphia to do something at the expense of the Managed Entities' creditors. For the reasons stated, the Court appropriately can, and will, direct Adelphia to cause the Managed Entities to make advances (and, for Michael Rigas, to provide indemnification) where that is a bona fide obligation of the Managed Entities in question. But it cannot, and will not, impose a like obligation where such payments are not required, and where the Rigases have sought to use their incumbency to address their own personal needs, at the expense of the Managed Entities' creditors.

The motion is accordingly granted in part and denied in part, as set forth more fully above. Adelphia is to settle an order in accordance with the foregoing on no less than two business days' notice by hand or fax.

course, baseless for a number of reasons...."").